RICHARD J. NELSON (State Bar No. 141658)
E-Mail:    *rnelson@sideman.com*
MICHAEL H. HEWITT (State Bar No. 309691)
E-Mail:    *mhewitt@sideman.com*
ARTUR A. MINASYAN (State Bar No. 322248)
E-Mail:    *aminasyan@sideman.com*
SIDEMAN & BANCROFT LLP
One Embarcadero Center, Twenty-Second Floor
San Francisco, California 94111-3711
Telephone:    (415) 392-1960
Facsimile:    (415) 392-0827

Attorneys for
HEWLETT PACKARD ENTERPRISE COMPANY,
HEWLETT PACKARD ENTERPRISE DEVELOPMENT LP and
HEWLETT-PACKARD DEVELOPMENT COMPANY, L.P.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| HEWLETT PACKARD ENTERPRISE COMPANY, a Delaware corporation; HEWLETT PACKARD ENTERPRISE DEVELOPMENT LP, a Delaware corporation; and HEWLETT-PACKARD DEVELOPMENT COMPANY, L.P., a Texas limited partnership,<br><br>         Plaintiffs,<br><br>    v.<br><br>ADVANCED DIGITAL SOLUTIONS INTERNATIONAL, INC., a California corporation, SHAHID SHEIKH, an individual, FARHAAD SHEIKH, an individual; KAMRAN SHEIKH, an individual; and K & F ASSOCIATES, LLC (dba TAPE4BACKUP), a California limited liability company,<br><br>         Defendants. | Case No. 3:20-cv-5447 VC<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**1. TRADEMARK INFRINGEMENT, 15 U.S.C. § 1114(1)(a);**<br><br>**2. TRADEMARK COUNTERFEITING, 15 U.S.C. § 1114(1)(b);**<br><br>**3. FEDERAL UNFAIR COMPETITION/FALSE ADVERTISING, 15 U.S.C. § 1125(a);**<br><br>**4. FEDERAL TRADEMARK DILUTION, 15 U.S.C. § 1125(c);**<br><br>**5. MISLEADING AND DECEPTIVE ADVERTISING, CAL. BUS. & PROF. CODE § 17500;**<br><br>**6. UNJUST ENRICHMENT**<br><br>**7. UNFAIR COMPETITION, CAL. BUS. & PROF. CODE § 17200** |

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**8.  BREACH OF CONTRACT (as to Prime Solutions Deal)**

**9.  BREACH OF CONTRACT (as to Google Deal)**

**10.  BREACH OF CONTRACT (as to PayPal Deal)**

**11.  BREACH OF CONTRACT (as to Other False End Customers)**

**12.  BREACH OF CONTRACT (as to sales to K&F Associates)**

**13.  BREACH OF CONTRACT (as to purchases from unauthorized sources)**

**14.  FRAUD**

**15.  CONVERSION**

**<u>DEMAND FOR JURY TRIAL</u>**

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

Case No. 3:20-cv-5447 VC

FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    Plaintiffs Hewlett Packard Enterprise Company ("HPE"), Hewlett Packard Enterprise

2   Development LP ("HPED"), and Hewlett-Packard Development Company, L.P. ("HPDC," and

3   together with HPE and HPED, "Plaintiffs") allege against Advanced Digital Solutions

4   International, Inc. ("ADSI"), Shahid Sheikh, Farhaad Sheikh, Kamran Sheikh, and K & F

5   Associates, LLC ("K&F") as follows:

6   **I.      INTRODUCTION**

7        1.      Defendant ADSI, a former Authorized Reseller of Plaintiff HPE's products, and its

8   employees and principals, Shahid Sheikh, Farhaad Sheikh, and Kamran Sheikh, have, for years,

9   abused ADSI's contractual relationship with HPE.  The misconduct, detailed herein, is wide-

10  ranging, and includes: (1) making material misrepresentations to HPE to obtain significantly

11  discounted HPE products that it would not have been otherwise able to purchase at that price from

12  HPE, (2) the purchase and sale of counterfeit HPE products, and (3) making misrepresentations on

13  its website and other online storefronts about its relationship to HPE to lure in customers.  Beyond

14  its tortious nature, Defendants' conduct is also a direct breach of ADSI's contractual obligations to

15  HPE.

16       2.      As just one particularly egregious example, ADSI requested special pricing on HPE

17  products for the purpose of selling those products to Prime Solutions, a company which ADSI

18  represented as a customer that required special discounts in order for it to purchase HPE products

19  instead of competitor products.  After arranging for the special pricing, ADSI then placed orders,

20  in 2015 and 2016, for over 45,000 products that ADSI claimed it was selling to Prime Solutions.

21  In total for those years, ADSI purchased HPE products allegedly for Prime Solutions with a list

22  price of over $2 million, which because of its misrepresentations to HPE, ADSI was able to

23  purchase for $936,155.  Through discovery in this litigation, HPE learned that Prime Solutions has

24  <u>never</u> purchased HPE products from ADSI.  HPE is aware of other similar schemes wherein ADSI

25  used the name of false end customers to obtain discounts, including Google and PayPal.  Upon

26  information and belief, ADSI has engaged in other similar misrepresentations which utilized false

27  end customers to obtain discounts from HPE.  Those same products were resold to other end

28

1   customers, giving ADSI a significant profit on the products, at HPE's expense.  ADSI collaborated

2   with co-Defendant K&F in selling these products that ADSI obtained wrongly from HPE.

3          3.      In addition, ADSI engaged in a complex scheme to purchase, import, market and

4   distribute counterfeit HPE products, bearing Plaintiff HPDC's and HPED's marks ("Infringing

5   Products"), through transactions on Defendants' respective online storefronts, and through other

6   distribution channels, thereby directly harming Plaintiffs, Plaintiffs' brands, and Plaintiffs'

7   established reputation for producing the highest quality networking communications and

8   information technology products and services.

9          4.      In April 2019, after determining that ADSI had been selling counterfeit products,

10   HPE terminated ADSI's contractual relationship with HPE.   Shahid Sheikh attempted to convince

11   HPE to reinstate ADSI, even claiming, falsely, to an HPE sales representative that ADSI's

12   credentials had been reinstated.  HPE refused.  Subsequently, Shahid went even further in his

13   effort to skirt HPE's controls, and used a fake name ("Shawn Shah"), and a fake job title ("Office

14   Manager"), to apply to HPE to make his affiliated company, K&F, an authorized HPE partner.

15   Shahid did not disclose the connection between K&F and ADSI to HPE as part of the on-boarding

16   request, and HPE approved K&F as an authorized partner.  Shahid continued to conduct business

17   that breached the HPE partner agreement, now using K&F in place of the terminated ADSI.  HPE

18   brings this action to protect consumers from receiving inferior counterfeit products, unauthorized

19   products, and to recover for the significant damage Defendants' unlawful conduct has caused to

20   Plaintiffs by its fraudulent and breaching conduct.

21   **II.**      **THE PARTIES**

22          5.      Prior to April 2019, HPE, a Delaware corporation, maintained its principal place of

23   business at 3000 Hanover  Street, Palo Alto, CA 94304.  In April 2019, HPE relocated its principal

24   place of business to 6280 America Center Drive, San Jose, CA 95002.  In December 2020, HPE

25   announced that it would move its principal place of business to 11445 Compaq Center Drive

26   West, Houston, Texas 77070.  However, for the majority of the time mentioned herein, HPE had

27   its principal place of business in the Northern District of California.

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

6.      HPED is, and at all times mentioned herein was, a Texas limited partnership with its principal place of business at 11445 Compaq Center Drive West, Houston, Texas 77070. HPED has an exclusive license to use, sub-license, and enforce trademarks that are the subject of this action.

7.      HPDC is a Texas limited partnership with its current principal place of business at 10300 Energy Drive, Spring, Texas 77389. Prior to January 2019, HPDC had its principal place of business at 11445 Compaq Center Drive West, Houston, Texas 77070.  HPDC has an exclusive license to use, sub-license, and enforce trademarks that are the subject of this action.

8.      On information and belief, Defendant Advanced Digital Solutions International, Inc., is a California corporation with its principal place of business at 4255 Business Center Drive, Fremont, California.  ADSI also maintains a warehouse located at 7026 Koll Center Parkway, Pleasanton, California, 94566.

9.      Shahid Sheikh is an individual residing at 1365 Lawrence Road, Danville, California 94506.  On information and belief, Shahid Sheikh owns ADSI with his wife.  Shahid Sheikh was the CEO of ADSI until January 2019.  Following January 1, 2019, Shahid Sheikh remained active with ADSI with the title of President.

10.     Defendant Farhaad Sheikh (also known as "Freddy") is an individual residing at 1365 Lawrence Road, Danville, California 94506.  On information and belief, Farhaad Sheikh is the Chief Executive Officer of Defendant ADSI since at least January 2019.  Farhaad is Shahid's son.

11.     On information and belief, Defendant Kamran Sheikh is an individual residing at 1365 Lawrence Road, Danville, California 94506.  Kamran is Shahid's son.

12.     On information and belief, Defendant K & F Associates LLC, is a California limited liability company with its principal place of business at 9000 Crow Canyon Road, Danville, California 94506 and the Business Center Address.   K&F also does business as tape4backup.com.

13.     Plaintiffs are informed and believe, and thereon allege, that Defendants undertook obligations or rights arising out of the subject events and happenings herein referred to, engaged in

1   actions of omissions, either intentional or negligent, regarding the subject events and happenings

2   herein referred to, and/or benefitted unjustly from the efforts, works, and goods of HPE.

3       14.     At all times relevant to this action, each Defendant was the agent, servant,

4   employee, partner, joint venturer, accomplice, conspirator, alter ego or surety of the other

5   Defendants and was acting within the scope of that agency, employment, partnership, venture, or

6   suretyship with the knowledge and consent or ratification of each of the other Defendants in doing

7   the things alleged in this Complaint.

8   **III.    JURISDICTION**

9       15.     This is an action involving  violations of the Trademark Act of 1946, 15 U.S.C. §§

10   1051 *et seq.* (the "Lanham Act"), and related causes of action. This Court has original subject

11   matter jurisdiction over this action pursuant to the provision of the Lanham Act, 15 U.S.C. § 1121,

12   as well as under 28 U.S.C. §§ 1331 and 1338(a) and (b).

13       16.     This Court has supplemental subject matter jurisdiction over the pendent state law

14   claims under 28 U.S.C. § 1367, because these claims are so related to Plaintiffs' claims under

15   federal law that they form part of the same case or controversy and derive from a common nucleus

16   of operative facts.

17       17.     This Court has personal jurisdiction over Defendants, who each reside in this

18   district, have engaged in business activities in this district, misled consumers in this district, and

19   knowingly and purposefully directed business activities at this district.

20       18.     Plaintiffs are informed and believe, and thereon allege, that ADSI and K&F are

21   doing business in the State of California, and/or participated in or undertook obligations or rights

22   arising out of the subject events and happenings herein referred to, engaged in actions or

23   omissions, either intentional or negligent, regarding the subject events and happenings referred to,

24   and/or benefited unjustly from the efforts, work, and goods of HPE.

25   **IV.    VENUE AND INTRA-DISTRICT ASSIGNMENT**

26       19.     Venue is proper in this district, pursuant to 28 U.S.C. § 1391, because this case has

27   already been assigned to a judge in this district, and because a substantial part of the property that

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   is the subject of the action is situated in this district. Venue is also proper because Defendants are

2   each subject to personal jurisdiction in this district.

3   **V.    FACTUAL ALLEGATIONS RELEVANT TO PLAINTIFFS, THEIR
4          INTELLECTUAL PROPERTY, AND DEFENDANTS' UNLAWFUL CONDUCT**

5           A.    <u>Plaintiffs' Business and History</u>

6           20.    Hewlett-Packard Company ("Hewlett-Packard") was founded in 1939 by engineers

7   David Packard and Bill Hewlett, who began business by designing and building electronic test

8   equipment from a garage in Palo Alto, California.  Hewlett-Packard became an innovator in its

9   field, developing technologies and inventing new products, growing to become one of the world's

10  largest information technology companies.  Hewlett-Packard specialized in developing and

11  manufacturing personal computers and printers, as well as enterprise hardware products and

12  services, including support services and enterprise software.  In late 2015, Hewlett-Packard split

13  into HP Inc. (specializing in the manufacture of personal computers, printers and printer

14  cartridges) and HPE (specializing in the manufacture of enterprise IT hardware, as well as the

15  creation and distribution of enterprise software and support services).

16          21.    Much like Hewlett-Packard, HPE is a multinational enterprise company that

17  delivers industry leading, high-quality information and technology products, consulting, and

18  support services to its large and diverse customer base, including governments, large enterprises,

19  and small to medium-sized businesses.   Among other areas, HPE's business includes

20  telecommunications networking hardware products and solutions, small to enterprise level data

21  storage products and solutions, data center configuration and installation products and services, as

22  well as various enterprise and information and technology management software solutions.

23          22.    Hewlett-Packard (and now HP Inc.) invested substantial effort and resources to

24  develop and promote public recognition of the "HP"-related marks.  These trademarks are owned

25  by HP Hewlett Packard Group LLC ("TM JV"), which has conveyed an exclusive license to use

26  and enforce the HP and HP Logo trademarks to HPDC.  In turn, HPDC granted a temporary

27  transitional use license to Hewlett Packard Enterprise Development LP ("HPED"), an HPE

28  subsidiary which holds title to intellectual property for HPE, so that HPE could use the HP and HP

SIDEMAN & BANCROFT LLP

LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  Logo trademarks during a phase-out period, until full implementation of the new HPE trademarks.

2  During this phase-out period, the HP Marks on HPE products signify to the public that the

3  products are high quality, genuine, HPE products. The use of the HP Marks by counterfeiters is

4  intended to trade on the famous status and wide-spread recognition of the HP Marks on HPE

5  products, and will likely continue after the phase-out period, to signal falsely that the products are

6  high-quality, genuine, HPE products, when in reality, they are not. HPE and HP Inc. have used the

7  HP Marks to identify goods and services as being genuine products, and the HP Marks are well-

8  recognized signifiers of high quality products and services.

9    23.    Hewlett-Packard, HPDC and TM JV have caused several trademarks to be

10  registered on the Principal Register of the U.S. Patent and Trademark Office in connection with a

11  range of telecommunications, computer hardware and software products and services, and TM JV

12  owns all rights, title, and interest in numerous federal trademark registrations (collectively, the

13  "HP Marks").  The HP Marks include, but are not limited to, the following:

| Mark | Registration Number | Registration Date |
|------|--------------------|--------------------|
| HP | 1,840,215 | June 21, 1994 |

16    24.    The TM JV also owns several "HPE"-related marks such as the HEWLETT

17  PACKARD, HEWLETT PACKARD ENTERPRISE, and HPE word marks, and the related design

18  marks, and has granted HPED an exclusive license to use and enforce those certain marks.  HPED

19  also owns several of the marks separate and apart from the TM JV, and, together, with the marks

20  owned by the TM JV (collectively, "HPE Marks"), continue to build on the legacy of the world-

21  famous HEWLETT-PACKARD mark, which was used since at least as early as 1941 in close

22  connection with the internationally well-known HP Marks by predecessor Hewlett-Packard, to

23  distinguish and signal the "HP" authorized products and services through a wide variety of media

24  including television, radio, newspapers, magazines, billboards, and web sites.  Through their close

25  connection, the public has come to associate the HPE Marks as having a common legacy with the

26  HP Marks.  HPED and the TM JV have caused several of these HPE Marks to be registered on the

27  Principal Register of the USPTO in connection with a range of telecommunications, computer

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

hardware and software products and services.  These registered HPE Marks include, but are not limited to the following:

| Mark | Registration Number | Registration Date |
|---|---|---|
| HEWLETT PACKARD ENTERPRISE | 5,209,743 | May 23, 2017 |
| HEWLETT PACKARD | 5,209,742 | May 23, 2017 |

25.    The HP and HPE Marks (collectively, the "TM JV Marks") are distinctive source identifiers and have been used in interstate commerce to identify and distinguish Plaintiffs' high quality products and services dating back to 1941.

26.    For over 75 years, the TM JV Marks have served to distinguish and signal Plaintiffs' authorized products and services through a wide variety of media including television, radio, newspapers, magazines, billboards, and web sites.

27.    Also as a result of Hewlett-Packard and now HP Inc.'s and HPE's extensive advertising and promotional efforts and the continuous use of the HP Marks by HP Inc. and/or HPE for over 75 years, the marks have attained one of the highest levels of brand recognition.

28.    The HP and HPE Marks are unquestionably famous both commercially and as defined by 15 U.S.C. Section 1125(c)(1), and became famous long before the infringing and counterfeit activity alleged herein.

29.    As a result of the longstanding and widespread use and promotion of the HP Marks, HP Inc.'s and HPE's customers worldwide have come to rely upon the HP Marks to identify high-quality goods and services.

30.    Many of HPE's products are purchased by the U.S. Government, the military, and by other industries, in critical and life-essential applications.  Counterfeit HPE products jeopardize the systems into which they are placed because they do not conform to HPE's design, specifications, production standards, or quality control, and thus lack reliability.  Counterfeit products that bear markings similar to, or substantially indistinguishable from, the TM JV Marks provide customers with a false assurance that the products they have purchased are reliable and

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

conform to HPE's high standards and that they are eligible for certain warranties.  When counterfeit products fail, the purchasers can suffer critical losses to their business, infrastructure, and security.

**B.**     **Counterfeit And Otherwise Materially Different "HP" and "HPE" Products**

31.     Counterfeit products that bear markings similar to the TM JV Marks provide customers with a false assurance that the products they have purchased (1) are reliable and conform with HPE's high standards, (2) come with applicable warranties, and (3) come with all of the necessary accessories sold with the product that have been selected and approved by HPE for use with the product.

32.     Plaintiffs' customers have come to rely on Plaintiffs' sophisticated networking products to run critical and highly secured networks supporting sensitive infrastructure throughout the world, including throughout the United States. Counterfeit products can cause privacy and security vulnerabilities, data loss, network downtime and substantial business interruption.

33.     In addition to harm to customers, the sale of counterfeit HPE products also harms Plaintiffs in many ways. Among these, counterfeit HPE products which fail or degrade create the false impression that HPE products are unreliable, thereby improperly tarnishing HPE's reputation and causing HPE to suffer lost sales and future business opportunities. When customers purchase HP- or HPE-branded parts that are counterfeit and unreliable, their image of HPE is diminished and HPE's opportunity to sell genuine, high-quality products to those customers may be lost forever. As a result, Plaintiffs suffer substantial and irreparable harm to their brand, image, business, and goodwill with the public. HPE also suffers lost sales when customers purchase counterfeit products instead of genuine HPE products.

**C.**     **HPE's Sales and Distribution Channels**

34.     HPE's product serial numbers allow HPE to maintain quality control and product traceability for warranty, service and other business purposes.  Specifically, an HPE product serial number is typically married to or associated with a myriad of product-related components or attributes, i.e., product SKU, sales order number, package ID number, manufacturer model number, and most relevant in this Action, warranty entitlement.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

35.     HPE sells the majority of its products through Distributors and "authorized Partners," rather than directly to end user consumers.  The majority of HPE's sales flow from HPE through its "Tier 1 Distributors" to its "Tier 2 Partners," and then to its end users.  HPE also sells a smaller percentage of its products directly to its largest customers and to certain Tier 2 Partners.

36.     During the period 2015 to present, HPE has had five Tier 1 general Distributors in the United States for the majority of its products:  Synnex, Ingram Micro, Tech Data, AVT, and Arrow Electronics.  HPE also has two specialty distributors, D&H Distributors and ScanSource, and several limited distributors for certain types of products.  HPE also maintains a separate list of distributors for its storage media products, consisting of the following entities which were authorized distributors at the times relevant to Plaintiff's claims: Accutech Data Supplies; Arrow Electronics Inc.; Avnet; Dexxxon Digital Storage; Digitek Computer Products; D&H Distributing Company; Essendent; Ingram Micro, Inc.; SP Richards Company/HorizonUSA; Supplies Network, Inc.; Synnex Corporation/New Age Electronics; Tech Data Corporation; and Vision Business Products, dba TeamTek Wholesale.

37.     There are approximately 7,000 Tier 2 Partners in the United States.  To become a Tier 2 Partner, an entity must meet an established set of business criteria, and provide HPE with detailed information about its business, including documentation confirming the business' state registration or incorporation, business partnership or operating agreements, the names of the officers who are authorized to sign documents for the business, and the business' tax identification number.

**D.     HPE Channel Sales Structure and Special Discounts**

38.     HPE uses a channel distribution model to sell products to end customers. That channel structure includes large distributors that purchase HPE products directly from HPE and stock them in regional warehouses. Companies that have applied to be HPE partners, and which HPE has accepted to be part of the channel program, purchase HPE products from the distributors, and sell the products to end customers.

39.     Pricing is set by the distributors to the partners, who in turn sell to end user customers.  When the normal pricing available to the partner is not good enough—such as when

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

the partner needs better pricing in order to beat out a bid by another company to win the business—the partner may request HPE to enter into a special agreement to provide a non-standard discount. HPE will grant such discounts on sales only for bona fide end users who demonstrate that a sufficient business case exists to justify granting these non-standard discounts. The special agreements designate the SKUs that can be purchased, the number of units for each SKU, the special discount for each SKU, and the time frame for transactions for this particular agreement. Many sales of HPE products—such as servers, hard drives, and memory—in the United States are sold without non-standard discounts. However, because customers of these types of products tend to be large organizations and government end users, it is common for such purchasers to seek non-standard discounts.

40.    Where an order quantity exceeds 100 products of any type, and requires non-standard discounts, it is assigned a "Big Deal" number, and carries a special set of terms and conditions. The Big Deal program Terms and Conditions include the following terms material to the allegations in this complaint:

   a. "Minimum quantity of 100 LTO units per deal per quarter. All end user information must be known and verified" (Deal Conditions, ¶ 1);

   b. "All reseller information must be known and verified" (Deal Conditions, ¶ 2); and,

   c. "Unless previously approved by HPE, all bids must be shipped directly to the end user" (Deal Conditions, ¶ 3).

41.    HPE has had special programs for sales of storage media, called "Storage Media Instant Rebate Program" since at least 2011. The program includes special rebates for particular SKUs as either a "General Instant Rebate" (GIR) or "Small Deal Instant Rebate" (GDIR). The rebates would be paid to enrolled HPE sales partners based on qualified shipments to end users during the promotional period, provided that all required conditions are met. The first step was for the partner to enroll in the program, by sending an email confirmation. In 2011, the confirmation said "I am confirming my organization's participation in the [program]. I have read, understand, and agree to abide by all of HP's terms conditions, and requirements—including all POS reporting requirements—for participation in this program." For the years 2012 to 2019, the email

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1   confirmation was identical or substantially identical to this.  To qualify for the GIR, partners must

2   meet specific criteria, including that the products cannot be sold to an end customer who received

3   other specific discounts, such as a Big Deal discount.  To qualify for the GDIR, the program had

4   specific criteria, including that the shipments must be made to a single end customer in the United

5   States.

6         42.   HPE has developed policies and internal controls to uncover and stop frauds that

7   exploit its Big Deal discounts, as described below. Those various policies and controls have been

8   refined over the years, as HP, and later HPE,  learned about the ways that fraud is conducted

9   against it, and what methods work in preventing such fraud. These controls demonstrate HPE's

10  commitment to stop fraudulent sales.

11        43.   As HPE discovers different fraudulent schemes, they institute new measures to

12  deter those schemes. These measures have included implementing new policies to better test the

13  veracity of claims that were made in applications for non-standard discounts, developing criteria to

14  determine which deals involved a higher level of risk and required greater scrutiny, and training

15  employees.

16        44.   HPE conducts training for its employees that (1) describes the nature of non-

17  standard discounts and how they can be exploited, (2) instructs sales personnel on how to thwart

18  discount frauds, and (3) warns of the consequences of approving fraudulent deals. Through this

19  annual training, employees learn that they could lose commissions on fraudulent deals, and that

20  they would be disciplined for knowingly allowing violations of this program, which could include

21  termination of their employment.

22        45.   HPE has employed different internal investigative groups to ensure that the sales

23  discounts are not exploited by people looking to obtain non-standard discounts by lying to HPE.

24  The investigators gather documents related to the transaction, interview participants (including

25  internal sales personnel, HPE channel partners, and end users), and collect information from

26  public sources to understand whether there was fraud, and if so, who was responsible for it. HPE

27  invests millions of dollars annually in its investigative group and its investigations.

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

46.     Despite the internal controls employed by HPE described above, there are still instances in which determined fraudsters succeed in committing discount fraud against HPE. Many discount frauds are uncovered early, before much damage has been done. In these instances, HPE generally takes care of the situation quickly, through deal terminations and partner terminations, where appropriate. Thus, by using the EUV process to detect fraudulent activity early, HPE often stops fraud preemptively.

E.     **Background on ADSI**

1.   **ADSI Became An HPE Partner in 2009**

47.     In 2009, ADSI became a Hewlett-Packard Partner.  When Hewlett-Packard split into HP Inc. and HPE in 2015, ADSI continued as an HPE Partner and agreed to the terms of the Hewlett Packard Enterprise Company U.S. Partner Agreement ("Partner Agreement").  Shahid Sheikh executed the Partner Agreement on behalf of ADSI.  ADSI renewed its partnership status each year through 2018 and, upon information and belief, each time it renewed its status, Shahid himself was the representative who executed the Agreement.

48.     As described in more detail below, ADSI violated the terms of its Partner Agreement by (1) purchasing counterfeit products from unauthorized sources, located both domestically and overseas, (2) providing false information to convince HPE to sell products to it at lower prices so that ADSI could sell those products to particular companies, (3) purchasing HPE products from unauthorized sources, and (4) selling HPE products to an affiliate company, so that it could improperly sell the products on online sales platforms.

49.     Upon information and belief, Plaintiffs allege that during the relevant times for this action, ADSI had a policy that all Sales Orders must have the signature of ADSI's CEO or Upper Management.   At all times relevant to this action, Shahid was either the CEO or Upper Management of ADSI, so he would have been involved in the approval of many (if not all) of ADSI's sales of products.

2.   **ADSI Agreed to HPE Partner Terms**

50.     Companies that desire to become a part of the HPE channel distribution structure apply to HPE, and if accepted, agree to the Partner Agreement.  ADSI agreed to the terms of the

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    Partner Agreement and thereupon engaged in transactions with HPE and its authorized

2    distributors, in which ADSI obtained financial and other benefits from HPE.  The Partner

3    Agreement encompasses the commercial relationship between HPE and the partner, in this case

4    ADSI,, and includes  the following terms material to the allegations in this complaint:

5           a.      Partners may resell HPE products and support to a "Customer", which is defined as

6           an entity which purchases the products for its own internal use only (Partner Agreement,

7           ¶¶1(c) and 2(d));

8           b.      Partners may purchase HPE products only from HPE or an HPE authorized

9           distributor (Partner Agreement, ¶2(c));

10          c.      Partners may not resell HPE products to any of its divisions or affiliates (Partner

11          Agreement, ¶2(d));

12          d.      Partners agree to comply with HPE's Partner Code of Conduct, and acknowledge

13          that HPE expects them "to conduct business in strict legal compliance and with the highest

14          ethical standards," and acknowledge that a "breach of HPE's Partner Code of Conduct may

15          be deemed a material breach of this Agreement" (Partner Agreement, ¶16(c)); and

16          e.      In the event of any material breach of the Partner Agreement, HPE has multiple

17          remedies, including without limitation requiring the breaching partner to refund or forfeit

18          any discounts or program payments paid or accrued during the breach period (Partner

19          Agreement, ¶15(D)).

20          51.     As referenced above, HPE partners must comply with the HPE Partner Code of

21   Conduct ("Code").  The Code requires partners "to maintain the highest standards of business

22   ethics," and to "become familiar with and comply with all laws that are relevant to their HPE

23   Partner Status.  (Code, page 2)  This requirement imposes an expectation that HPE partners will

24   act with integrity:

25              HPE requires that HPE Partners (1) implement effective business controls
                that prevent and detect unlawful conduct; (2) comply with contractual
26              provisions that require strict adherence to all applicable anti-corruption laws
                and other laws that are relevant to their HPE Partner status and their HPE
27              Partner business; (3) grant and cooperate with HPE audit rights to review the
                Partners' compliance with such laws relevant to their HPE partner status; (4)
28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

to the extent they become aware, proactively report to HPE actual or potential violations of this Partner Code of Conduct or applicable laws involving HPE products by their employees and representatives, as well as actual or potential violations of HPE's Standards of Business Conduct, this Partner Code of Conduct, and applicable laws by HPE's employees and representatives; and (5) provide certification of their compliance with these laws and complete all related HPE training and due diligence as and when requested by HPE. (Code, page 2)

52.     Each HPE Partner is required to ensure that all personnel comply with the Code: "This Partner Code of Conduct is applicable to HPE Partners, their employees, temporary employees, agents, independent contractors, and subcontractors." *Id*. Moreover, the Partner's dealings must be accurate and honest: "HPE Partners' marketing and sales practices must reflect a commitment to accurate, honest, and fair dealings with their current and potential customers. HPE Partners must not engage in any misleading or deceptive practices." (Code, page 6)

53.     Attached to ADSI's Partner Agreement is also an HPE U.S. Partner Roles and Responsibilities Addendum, which requires partners to purchase all HPE Products "only from Distributors listed on the U.S. Distributor Summary Matrix on the HPE Partner Portal," and requires partners to not purchase HPE products from other Partners or from any unauthorized source.   Specifically, the HPE U.S. Partner Roles and Responsibilities Addendum states:

"*1.  Purchasing*

*a.  Sourcing*

*All Products must be purchased for resale purposes only from Distributors listed on the U.S. Distributor Summary Matrix on the HPE Partner Portal. You may not purchase Products for resale purposes from other Partners and/or any unauthorized sources. You may not purchase Products for your internal use.*

*Direct purchasing relationships with HPE may be established by signing additional Addenda or as specified in additional program terms and conditions.*

*You may resell Products over the Internet, via an HPE approved URL in the name of your company provided that you implement policies supporting Customer satisfaction as a primary concern; provide presales Customer support; and do not resell Products via an auction.*

1
2
3

*You may resell Products only via a URL that matches your legal name or d/b/a name. New or additional domain names require HPE approval prior to the posting of Products."*

4    **F.    Discovery of Fraudulent Activity by ADSI**

5    54.    On January 15, 2021, ADSI responded to discovery in this litigation and produced

6    a spreadsheet detailing its purchases and sales of HPE products.  According to ADSI's records,

7    which ADSI later confirmed consisted of all of ADSI's purchase and sales records in its

8    possession, custody and control, ADSI had no records of selling products to an array of end

9    customers that ADSI had represented to HPE and HPE's distributors were ADSI's intended end

10   customers.  In other words, in January 2021, HPE first discovered that ADSI had provided false

11   information to HPE and/or HPE's authorized distributors (which then transmitted the false

12   information to HPE) to obtain special pricing to which ADSI was not entitled.  Furthermore, the

13   data disclosed that ADSI sold HPE products to its affiliate company, K&F, which, upon

14   information and belief, then sold the products to other end customers using the affiliate's URL and

15   other online storefronts.  ADSI did not disclose these sales to HPE prior to January 2021.  Each of

16   the schemes that HPE is currently aware of is described below.

17               **1.   Fake Sales to Prime Solutions**

18   55.    Beginning in September 2012, ADSI requested special pricing from HPE through

19   HPE Authorized Distributors allegedly for Prime Solutions, located at 4261 Business Center

20   Drive, Fremont, California, which offers "laser and ink marking services for the electronic[s]

21   industry."  These requests continued from 2012 until July 2017, and included regular written and

22   oral statements by ADSI, its management, and its employees, that products it was purchasing

23   under Prime Solutions deals were indeed going to Prime Solutions.

24   56.    For example, on or around May 27, 2015, when ADSI was still a Partner of

25   Hewlett-Packard, ADSI requested to purchase HP storage media products from Accutech, seeking

26   special pricing  for "end user" Prime Solutions.  Following ADSI's request, Accutech's Paul

27   Grenier sent an email to HP's "Storage Media Desk" (storagemedia@hp.com) asking for a "bid"

28   on 1,000 C7975A storage media tape drives for Reseller ADSI, and End User Prime Solutions.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   Shortly thereafter, HP's Storage Media Desk provided estimated pricing for the deal based on the

2   representation that the end customer was Prime Solutions, under bid number 17663.  Grenier then

3   requested a Big Deal number to formalize the special pricing, listing Prime Solutions as the end

4   user with an address as 4261 Business Center Drive, Fremont, CA 94538, which request was

5   granted under Big Deal number 91786548, confirming the special discount pricing for end

6   customer Prime Solutions.  That particular Big Deal began on December 8, 2014 and ran until

7   April 23, 2015.  HPE sold approximately 14,300 tapes under that Big Deal alone.

8          57.     Later that year, in November 2015, after Hewlett-Packard split into HP Inc. and

9   HPE, ADSI caused the special pricing requests to be submitted to HPE's bid desk, and continued

10  to receive approval for the special pricing for Prime Solutions based on the representations that

11  Prime Solutions was the end user.  Plaintiffs allege on information and belief that ADSI made the

12  requests to Accutech, knowing that it would trigger Accutech's passing on those requests to HPE

13  for analysis and approval. Throughout the various orders from ADSI for products that it claimed

14  were being sold to Prime Solutions, HPE was consistently informed by Grenier, as well as

15  representatives of ADSI, including Nabia Uddin, Michael Minhas, Norman Karamat, and Rita Lu,

16  in addition to Shahid Sheikh and Freddy Sheikh, that ADSI needed special discount pricing for

17  Prime Solutions. For example, on December 9, 2015, Paul Grenier sent an email to HPE's storage

18  media pricing desk requesting  special pricing for the following products for "Prime Solutions" in

19  Fremont, CA:

20          C7976A x 1000

21          C7975A x 1000

22          C7974A x 400

23          C7978A x 200

24          C8011A x 300

25          C8010A x 300

26          HPE granted the special pricing for the products based on Grenier's representations under

27  Bid number 19202, which was ultimately confirmed under Big Deal Number 92884916.  Under

28  Big Deal 92884916, which ran from November 10, 2015 to November 11, 2016, ADSI purchased

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  approximately 33,189 HPE tape products at a steep discount based on its representations that the
2  products would be sold to Prime Solutions.

3      58.     Each time a special pricing request was made for Prime Solutions, it was ADSI that
4  directed Accutech to submit the requests to HPE.  For example, on or around July 6, 2016, Paul
5  Grenier of Accutech requested special pricing on SKU C8010A for end user "Prime Solutions" on
6  behalf of reseller "ADSI."  HPE informed Grenier that HPE was "no longer taking bids on [sku
7  C8010A]", which Grenier forwarded to an employee of ADSI, Nabia Uddin.   Uddin then
8  forwarded the chain to Pat Mayock, an account manager with HPE, stating that "[w]e have an
9  order in with Accutech" and asking for assistance to "fulfill" the order.  After several more urgent
10  emails from Uddin, Mayock informed Uddin that the product was "EOL" (end-of-life) and that
11  HPE had no additional product to ship, providing the announcement about the end-of-life decision.

12      59.     In addition, ADSI regularly reinforced HPE's belief that products intended for
13  "Prime Solutions" were actually being sold and shipped to Prime Solutions.  Between 2015 and
14  2018, HPE sales personnel, including Pat Mayock, received written confirmation indicating that
15  products purchased under the "Prime Solutions" Big Deal numbers were for "Prime Solutions."
16  Pat Mayock, HPE's primary reseller representative for ADSI, spoke with and met with ADSI sales
17  personnel, who continually represented to Mayock and HPE that Prime Solutions was the end
18  customer for the products they were ordering under the approved big deals, and never indicated to
19  HPE that Prime Solutions was not the true end customer.  Mayock would also regularly visit
20  ADSI's offices to meet with ADSI sales personnel and discuss HPE's promotions and technology.
21  Specifically, on November 3, 2017, Pat Mayock visited with ADSI sales personnel including
22  ADSI's now Chief Executive Officer, Farhaad "Freddy" Sheikh, to discuss ADSI's sales pipeline
23  and efforts.  At that meeting, upon information and belief, Mayock discussed the sales to Prime
24  Solutions and no one at ADSI questioned or corrected Mayock.  Mayock visited ADSI's offices at
25  least several times in 2015 alone, and never received any indication from ADSI that products
26  intended for Prime Solutions were not being sold to Prime Solutions, giving Mayock and HPE the
27  false assurance that the sales were indeed going to Prime Solutions.

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

60.   Among other things, ADSI submitted invoices with logos of another Prime Solutions, located in Chantilly, Virginia, which, upon information and belief, ADSI and the Sheikh's intentionally used to further obfuscate the true end customer and reassure HPE that the products were going to Prime Solutions at the 4261 Business Center Drive address.   Upon information and belief, the Prime Solutions located in Chantilly, Virginia, is not affiliated with the Prime Solutions in Fremont, California.



61.   In fact, as HPE only recently discovered, Prime Solutions located in Fremont, California, which has its business address at the same location identified in the Prime Solutions Purchase Orders and Invoices, did not, and has never, purchased any HPE products from ADSI. The founder and president of Prime Solutions, Harry Moroyan, testified in a deposition on June 2,

2021, that his company has never purchased products, in particular HPE tape media, from ADSI. In addition to Mr. Moroyan's unequivocal testimony, ADSI also admitted in response to HPE's Requests for Admission that it never sold HPE Products to Prime Solutions.  As ADSI's Person Most Knowledgeable, Shahid Sheikh, also further confirmed in a deposition on June 24, 2021, that he was not aware of any sales of HPE products to Prime Solutions.

62.    In total, from June 26, 2012 to November 2, 2017, ADSI purchased 95,701 HPE tape drives for "Prime Solutions."  Upon information and belief, ADSI resold none of those products to Prime Solutions.  As a result of its numerous false representations to HPE, ADSI was able to purchase those products at non-standard discounts, which HPE would not have allowed if it knew the truth that ADSI was breaching a variety of its commitments in the Agreement and in the separate agreement regarding the Big Deal set up for Prime Solutions.  In all, ADSI obtained discounts from HPE for products that were claimed to be sold to Prime Solutions in excess of $3 million.

63.    ADSI also provided false information to HPE in order to obtain rebates from HPE that it was otherwise not entitled to receive.  ADSI claimed that it was eligible for rebates pursuant to the General Instant Rebate or Small Deal Instant Rebate programs, when in fact ADSI did not qualify, such as ordering for stocking purposes rather than selling to the specific end customer. ADSI requested rebates for purchases of storage media products that ADSI falsely claimed were being sold to Prime Solutions.  HPE discovered in 2021 that all of these rebate requests were false:

| Special Pricing Program | Distribution Sales Date | Invoice No | Product Number | End User Raw Name | Total Qty | HP Net Price |
|---|---|---|---|---|---|---|
| GIR_SDIR | 12/19/2011 | S1161901 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 1/3/2012 | S1165228 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 1/3/2012 | S1165229 | C7974A | PRIME SOLUTIONS | 500 | $16,788 |
| GIR_SDIR | 1/10/2012 | S1168295 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 1/23/2012 | S1172988 | C7973A | PRIME SOLUTIONS | 558 | $16,004 |
| GIR_SDIR | 1/23/2012 | S1172987 | C7974A | PRIME SOLUTIONS | 750 | $25,182 |
| GIR_SDIR | 4/20/2012 | S1208272 | C7973A | PRIME SOLUTIONS | 500 | $14,541 |
| GIR_SDIR | 4/20/2012 | S1208272 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 4/23/2012 | S1208246 | C7975A | PRIME SOLUTIONS | 200 | $10,166 |
| GIR_SDIR | 4/24/2012 | S1208307 | C7974A | PRIME SOLUTIONS | 500 | $16,788 |
| GIR_SDIR | 4/24/2012 | S1208307 | C7975A | PRIME SOLUTIONS | 200 | $10,166 |

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

| Special Pricing Program | Distribution Sales Date | Invoice No | Product Number | End User Raw Name | Total Qty | HP Net Price |
|---|---|---|---|---|---|---|
| GIR_SDIR | 4/27/2012 | S1209927 | C7975A | PRIME SOLUTIONS | 200 | $10,166 |
| GIR_SDIR | 5/2/2012 | S1211594 | C7974A | PRIME SOLUTIONS | 500 | $16,788 |
| GIR_SDIR | 5/15/2012 | S1216333 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 5/15/2012 | S1216333 | C7975A | PRIME SOLUTIONS | 200 | $9,861 |
| GIR_SDIR | 5/22/2012 | S1219043 | C7973A | PRIME SOLUTIONS | 200 | $5,816 |
| GIR_SDIR | 5/25/2012 | S1220748 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 6/6/2012 | S1225784 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 6/8/2012 | S1225822 | C7973A | PRIME SOLUTIONS | 200 | $5,816 |
| GIR_SDIR | 6/8/2012 | S1225822 | C7975A | PRIME SOLUTIONS | 100 | $4,783 |
| GIR_SDIR | 6/29/2012 | S1233735 | C7975A | PRIME SOLUTIONS | 300 | $14,348 |
| GIR_SDIR | 7/11/2012 | S1237538 | C7975A | PRIME SOLUTIONS | 200 | $9,087 |
| GIR_SDIR | 8/6/2012 | S1247587 | C7973A | PRIME SOLUTIONS | 200 | $5,816 |
| GIR_SDIR | 8/6/2012 | S1247587 | C7975A | PRIME SOLUTIONS | 200 | $8,815 |
| GIR_SDIR | 8/9/2012 | S1249398 | C7973A | PRIME SOLUTIONS | 300 | $8,724 |
| GIR_SDIR | 8/9/2012 | S1249398 | C7975A | PRIME SOLUTIONS | 300 | $13,222 |
| GIR_SDIR | 9/14/2012 | S1263816 | C7975A | PRIME SOLUTIONS | 300 | $13,222 |
| GIR_SDIR | 10/26/2012 | S1279915 | C7975A | PRIME SOLUTIONS | 35 | $1,450 |
| GIR_SDIR | 10/30/2012 | S1281473 | C7975A | PRIME SOLUTIONS | 200 | $8,286 |
| GIR_SDIR | 11/8/2012 | S1284654 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 11/8/2012 | S1284654 | C7975A | PRIME SOLUTIONS | 200 | $7,954 |
| GIR_SDIR | 11/20/2012 | S1289115 | C7975A | PRIME SOLUTIONS | 200 | $7,954 |
| GIR_SDIR | 11/26/2012 | S1289737 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 11/26/2012 | S1289737 | C7975A | PRIME SOLUTIONS | 200 | $7,954 |
| GIR_SDIR | 12/5/2012 | S1293822 | C7975A | PRIME SOLUTIONS | 500 | $18,891 |
| GIR_SDIR | 12/7/2012 | S1295400 | C7975A | PRIME SOLUTIONS | 110 | $4,156 |
| GIR_SDIR | 12/11/2012 | S1297428 | C7975A | PRIME SOLUTIONS | 390 | $14,735 |
| GIR_SDIR | 12/12/2012 | S1296839 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 12/12/2012 | S1296839 | C7975A | PRIME SOLUTIONS | 120 | $4,534 |
| GIR_SDIR | 1/10/2013 | S1305892 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 1/15/2013 | S1308657 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 1/15/2013 | S1308657 | C7975A | PRIME SOLUTIONS | 300 | $11,108 |
| GIR_SDIR | 1/30/2013 | S1312506 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 2/5/2013 | S1314183 | C7975A | PRIME SOLUTIONS | 200 | $7,257 |
| GIR_SDIR | 2/11/2013 | S1315630 | C7975A | PRIME SOLUTIONS | 400 | $14,514 |
| GIR_SDIR | 2/18/2013 | S1317894 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 2/18/2013 | S1317894 | C7975A | PRIME SOLUTIONS | 500 | $18,142 |
| GIR_SDIR | 2/28/2013 | S1321591 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 2/28/2013 | S1321591 | C7975A | PRIME SOLUTIONS | 300 | $10,885 |
| GIR_SDIR | 3/15/2013 | S1327318 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 3/21/2013 | S1328094 | C5709A | PRIME SOLUTIONS | 81 | $455 |

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

20

Case No. 3:20-cv-5447 VC

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

LAW OFFICES

SIDEMAN & BANCROFT LLP

ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Special Pricing Program | Distribution Sales Date | Invoice No | Product Number | End User Raw Name | Total Qty | HP Net Price |
|---|---|---|---|---|---|---|
| GIR_SDIR | 3/21/2013 | S1328094 | C7975A | PRIME SOLUTIONS | 200 | $7,039 |
| GIR_SDIR | 4/5/2013 | S1333080 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 4/5/2013 | S1333080 | C7975A | PRIME SOLUTIONS | 200 | $7,039 |
| GIR_SDIR | 4/26/2013 | S1339545 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 4/26/2013 | S1339545 | C7975A | PRIME SOLUTIONS | 500 | $17,597 |
| GIR_SDIR | 4/26/2013 | S1339262 | C7975A | PRIME SOLUTIONS | 70 | $2,464 |
| GIR_SDIR | 6/18/2013 | S1355015 | C7974A | PRIME SOLUTIONS | 500 | $16,788 |
| GIR_SDIR | 6/20/2013 | S1355905 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 6/20/2013 | S1355905 | C7975A | PRIME SOLUTIONS | 100 | $3,177 |
| GIR_SDIR | 7/9/2013 | S1360833 | C7976A | PRIME SOLUTIONS | 100 | $7,952 |
| GIR_SDIR | 7/15/2013 | S1362641 | C7974A | PRIME SOLUTIONS | 1000 | $33,576 |
| GIR_SDIR | 7/29/2013 | S1367741 | C7973A | PRIME SOLUTIONS | 120 | $3,490 |
| GIR_SDIR | 7/30/2013 | S1367649 | C7973A | PRIME SOLUTIONS | 60 | $1,745 |
| GIR_SDIR | 7/31/2013 | S1368134 | C7973A | PRIME SOLUTIONS | 200 | $5,816 |
| GIR_SDIR | 9/13/2013 | S1383355 | C7975A | PRIME SOLUTIONS | 500 | $14,051 |
| GIR_SDIR | 9/18/2013 | S1385550 | C7975A | PRIME SOLUTIONS | 500 | $14,051 |
| GIR_SDIR | 9/25/2013 | S1387689 | C7975A | PRIME SOLUTIONS | 1000 | $28,101 |
| SDIR | 11/8/2013 | S1402787 | C7974A | PRIME SOLUTIONS | 1000 | $33,576.20 |
| SDIR | 11/8/2013 | S1402787 | C7975A | PRIME SOLUTIONS | 1000 | $26,697.40 |
| SDIR | 11/19/2013 | S1405388 | C7976A | PRIME SOLUTIONS | 100 | $6,745.40 |
| SDIR | 1/21/2014 | S1422129 | C7974A | PRIME SOLUTIONS | 1000 | $33,576.20 |
| SDIR | 1/21/2014 | S1422129 | C7975A | PRIME SOLUTIONS | 1000 | $26,697.40 |
| SDIR | 1/23/2014 | S1425191 | C7974A | PRIME SOLUTIONS | 1000 | $33,576.20 |
| SDIR | 2/12/2014 | S1431803 | C7974A | PRIME SOLUTIONS | 1000 | $33,576.20 |
| SDIR | 2/27/2014 | S1436858 | C7975A | PRIME SOLUTIONS | 1000 | $26,697.40 |
| SDIR | 2/27/2014 | S1436858 | C7976A | PRIME SOLUTIONS | 200 | $11,689.32 |
| SDIR | 3/20/2014 | S1443942 | C7974A | PRIME SOLUTIONS | 300 | $10,072.86 |
| SDIR | 3/26/2014 | S1445875 | C7974A | PRIME SOLUTIONS | 500 | $16,788.10 |
| SDIR | 3/26/2014 | S1445875 | C7975A | PRIME SOLUTIONS | 500 | $13,348.70 |
| SDIR | 4/7/2014 | S1449594 | C7976A | PRIME SOLUTIONS | 100 | $5,442.72 |
| SDIR | 4/18/2014 | S1453841 | C7974A | PRIME SOLUTIONS | 500 | $16,788.10 |
| SDIR | 5/1/2014 | S1458498 | C7975A | PRIME SOLUTIONS | 100 | $2,669.74 |
| SDIR | 5/2/2014 | S1459040 | C7974A | PRIME SOLUTIONS | 500 | $16,788.10 |
| SDIR | 5/2/2014 | S1459040 | C7975A | PRIME SOLUTIONS | 500 | $13,348.70 |
| GIR | 5/15/2014 | S1462732 | C7976A | PRIME SOLUTIONS | 40 | $2,100.99 |
| SDIR | 6/2/2014 | S1467952 | C7973A | PRIME SOLUTIONS | 200 | $5,816.24 |
| SDIR | 6/19/2014 | S1474092 | C7976A | PRIME SOLUTIONS | 100 | $4,989.74 |
| SDIR | 7/22/2014 | S1483946 | C7975A | PRIME SOLUTIONS | 700 | $18,127.90 |

64.     In total, from 2011 to 2014, ADSI claimed to have purchased approximately 45,534 HPE tape drives for Prime Solutions on the GIR or SDIR rebate programs.  As a result of the false statements provided by ADSI, HPE paid rebates to ADSI which HPE would not have done if it knew the truth.

### 2.   Fake Sales to Google

65.     As with the "Prime Solutions" scheme, ADSI also used "Google" as a purported end user to obtain special discount pricing on HPE storage media tape products.  On February 26, 2016, William Lai of HPE Authorized Distributor Synnex requested "bid pricing" for "Reseller: ADSI" and "[end user]: Google" for 200 C7977A storage media tapes.  Upon information and belief, ADSI provided the information to Lai and requested the special discount from HPE.  HPE's bid desk provided special pricing information under Bid number 20023, and when prompted for "complete End user info", Mr. Lai identified the customer as "Google, 1600 Amphitheatre Pkwy, Mountain View."   The special pricing was ultimately confirmed by HPE in Big Deal No. 93250247.

66.     Over the next three years, until approximately February 21, 2019, ADSI requested discount pricing for tens of thousands of storage tape media products allegedly for Google, Inc. Based on ADSI's representation that the products would be sold to end user Google, Inc., HPE approved the special pricing each time.  ADSI representatives even made direct inquiries to HPE seeking discounted pricing for Google. On December 22, 2016, Nabia Uddin, using her @adsii.com email address, sent an email to Pat Mayock, and copying ADSI's VP of Sales, Mike Minhas, stating that she needed Mayock's help because "Goolge [sic] is looking to make a year end purchase," and they were looking to get "agressive [sic] year end pricing [to] close the deal" for 5,000 LTO-5 and LTO-6 tapes.  Based on ADSI's representation, and because Google was a large potential customer, HPE's Mayock  stated that, among other things, HPE needed to be "really sharp on pricing" since the bid was for Google.

67.     Throughout the Google fraud, upon information and belief, ADSI created fake invoices or directed Accutech to submit fake invoices containing "ship to" information for "Google c/o ADSI."   The invoices were submitted to HPE to further the illusion that ADSI was

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   legitimately selling to Google. ADSI even recycled some of fake invoices it had created for

2   "Prime Solutions". For example, in one invoice, ADSI lists the "Bill To" information as

3   "GOOGLE, ap@google.com" with "Ship to:" information as "Prime Solution" [sic], with the

4   4261 Business Center Drive address. The metadata for some of the invoices shows the "Author"

5   as Shahid Sheikh and that they were created from an Excel file titled "Sony Invoices."

6       68.    ADSI's records show that some of the products that ADSI represented were to be

7   sold to "Google" were instead sold to co-defendant K&F, which is controlled by Shahid as an

8   online reseller of HPE products. As just one example, a January 31, 2019, invoice from Accutech

9   showed that ADSI purchased approximately 400 tape drive products, that it claimed were for sale

10  to Google.



21      ADSI's records, however, show the same transaction with the same products and purchase

22  order number with the end customer listed as K&F, not Google. In fact, ADSI's own sales records

23  produced in this litigation never listed Google as a customer. At his deposition on June 24, 2021,

24  Shahid conceded that ADSI sold no HPE products to Google.

25      69.    HPE discovered that ADSI did not sell these products to Gogle when ADSI

26  produced its sales records in this litigation in January 2021. In total, during the relevant time

27  period, ADSI arranged to purchase 41,238 tape drives purportedly for end user Google. As a

28  result of the false statements provided by ADSI, HPE permitted ADSI to purchase the products

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   with very high discounts, which HPE would not have allowed if it knew the truth, that ADSI was

2   breaching a variety of its commitments in the Agreement and in the separate agreement regarding

3   the Big Deal set up for Google.  ADSI obtained discounts from HPE for products that were

4   claimed to be sold to Google, obtaining unearned discounts in excess of $1.5 million.

5   **3.  Fake Sales to PayPal**

6        70.     ADSI also provided false information to HPE in order to participate in PayPal's

7   "Big Deal" opportunity which allowed resellers to purchase heavily discounted HPE products to

8   sell to PayPal.  On July 7, 2017, ADSI's VP Mike Minhas sent an email to Shams Madhani at

9   PayPal, requesting that Madhani confirm to HPE that PayPal wished to have ADSI added to the

10  Big Deal so ADSI could purchase discounted HPE products to sell to PayPal.     Madhani

11  responded "Approved," in his reply email on July 7, copying the email to HPE's Raymond

12  Allustiarti.  ADSI's Nabia Uddin sent an email on the same day (July 7): "Hey Raymond, Happy

13  Friday to you!  Hope your day is going well.  Can you please send me a copy of the Paypal big

14  deal?"  On July 12 and 13, Uddin emailed Allustiarti requesting to know if ADSI had been added

15  to the PayPal Big Deal yet. On July 13, 2017, HPE's Carlos Ivan Nava Flores sent an email to

16  Uddin, Allustiarti, and Minhas, asking which deal ADSI wanted to be added on.  ADSI's Minhas

17  responded on July 14: "PayPal please."

18       71.     From at least July 2017 to August 8, 2017, ADSI ordered 432 products from HPE

19  through PayPal's "Big Deal", consisting mostly of hard drives and memory discs.  The total list

20  price for these products was $399,104, but ADSI only paid $47,704 because HPE provided "Big

21  Deal" discounts with the understanding that ADSI would sell the discounted products to PayPal.

22       72.     HPE discovered that ADSI did not sell these products to PayPal when ADSI

23  produced its sales records in this litigation in January 2021.  PayPal subsequently confirmed that

24  these purchases were fraudulent when it responded to a subpoena in this litigation on June 2, 2021,

25  stating that they purchased limited HPE products from ADSI, and that was only two HPE servers

26  and associated components.  Neither of these servers were part of the PayPal "Big Deal", and thus

27  ADSI did not sell any of the 432 products to PayPal, despite obtaining discounts from HPE using

28  the special pricing set up exclusively for PayPal.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

24

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

73. HPE alleges upon information and belief that ADSI falsely obtained heavily discounted products upon the misrepresentation that they were being sold to PayPal, and then diverted those products to an affiliated company also controlled by Shahid, K&F, which then sold them on platforms including eBay.

74. In total, during the relevant time period, ADSI arranged to purchase 432 HPE products purportedly for end user PayPal. As a result of the false statements provided by ADSI, HPE permitted ADSI to purchase the products with very high discounts, which HPE would not have allowed if it knew the truth, that ADSI was breaching a variety of its commitments in the Agreement and in the separate agreement regarding the Big Deal set up for PayPal. ADSI obtained discounts from HPE for products that were claimed to be sold to PayPal, obtaining unearned discounts in excess of $300,000.

#### 4. Fake Sales to Other Alleged End Customers

75. ADSI provided false information to HPE in order to obtain discounts from HPE that it was otherwise not entitled to receive. ADSI obtained Big Deal discounts for particular identified customers. HPE was not aware that ADSI had falsely claimed eligibility for the special discounts until after January 2021, when ADSI provided its sales records in this action.

76. The following chart shows the transactions for which ADSI requested and received Big Deal discounts, but which ADSI's records do not indicate that it actually sold the products to the customer:

| End Customer | Date Range | SKU | Quantity | Big Deal No |
|---|---|---|---|---|
| A QUICK RECOVERY | 2/7/2017-8/10/2017 | C7974A | 2400 | 94637355, 94988965 |
| | 1/26/2017 | C7975A | 600 | 94637355 |
| CITY OF OCEANSIDE/IT DEPT. | 7/16/2019 | C7975A | 200 | 96648695 |
| CITY OF READING | 9/28/2017-3/12/2019 | C7977A | 120 | 94790269, 95676988 |
| CITY OF SAN DIEGO | 1/14/2019 | C7974A | 1000 | 95676988 |
| DXC TECHNOLOGY COMPANY | 10/19/2016-6/21/2017 | C7975A | 1080 | 94368949, 94608438, 94852011 |
| | 11/10/2017-12/15/2017 | C7976A | 1800 | 94852011 |
| | 6/1/2017-8/9/2017 | C7977A | 990 | 94852011 |

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

| End Customer | Date Range | SKU | Quantity | Big Deal No |
|---|---|---|---|---|
| | 5/31/2017-6/1/2017 | C7978A | 30 | 94852011 |
| LUMENTUM OPERATIONS | 11/3/2016 | C7976A | 200 | 94452562 |
| MARION COUNTY LEGAL COUNCIL | 9/7/2016 | C7974A | 100 | 94250608 |
| | 9/7/2016 | C7975A | 100 | 94250608 |
| MONMOUTH UNIVERSITY | 8/22/2019 | C7976A | 100 | 96648695 |
| NASA | 7/15/2019 | C7976A | 100 | 96648695 |
| | 8/16/2018 | C7977A | 30 | 95676988 |
| | 7/15/2019 | C7978A | 8 | 96648695 |
| NEWPORT BEACH POLICE DEPT | 9/28/2018 | C7976A | 60 | 95676988 |
| | 10/29/2019 | C7976A | 50 | 96648695 |
| NOAA | 8/7/2018 | C7977A | 50 | 95676988 |
| PERSONALIS, INC | 5/26/2017-11/15/2018 | C7977A | 260 | 94933136, 95350504, 96274229 |
| PWC | 2/1/2018 | C7975A | 400 | 95539014 |
| QTS - QUANTUM TECHNICAL SERVICES | 9/6/2016 | C7975A | 240 | 94250727 |
| | 10/11/2016 | C7975A | 1075 | 94378879 |
| | 11/29/2016 | C7975A | 300 | 94532246 |
| | 12/15/2016 | C7975A | 1000 | 94378879 |
| | 3/13/2017 | C7975A | 600 | 94763626 |
| | 3/16/2017 | C7975A | 600 | 94763626 |
| SAN DIEGO POLICE DEPARTMENT | 9/21/2017-8/14/2018 | C7974A | 5340 | 95201858, 95688260, 95938403 |
| | 6/14/2019 | C7976A | 60 | 96648695 |
| | 10/25/2018-6/17/2019 | C7977A | 700 | 96201575, 96648695 |
| SUTHERLAND GLOBAL SERVICES INC | 6/20/2017 | C7975A | 200 | 94985930 |
| | 6/20/2017 | C7976A | 60 | 94985930 |
| US NAVY | 7/13/2018 | C7977A | 124 | 95676988 |
| WASHINGTON METRO AREA TRANSIT | 7/7/2017 | C7975A | 600 | 94978455 |

**5. Incentive Program Payment Requests for Fake Sales to Prime Solutions and Google**

77. In addition to the special discount pricing granted to ADSI for its false representations that it was selling to Prime Solutions and Google, among others, ADSI and its sales representatives also participated in various HPE sales incentive programs based on the purported sales to false end customers.

78. HPE's incentive programs, and its historical counterparts, such as "Engage and Grow," "LTO 6 Growth Program," and the "Reseller Storage Media Incentive Program," reward

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

individual sales personnel working at HPE Partner companies for selling eligible HPE products. In order to receive benefits under these programs, the individual participants must submit a claim within a certain period of time after the customer invoice, along with supporting documentation, and obtain HPE's approval.  The participants must also sign and abide by the terms and conditions for each sale incentive program, which generally forbid participants from submitting false claims or incorrect information, or else risk reversal of the awarded reward payments, termination from the incentive program, or termination as a Partner. ADSI and its sales personnel submitted numerous claims based on fraudulent sales and forged documents, in violation of the terms and conditions of the incentive programs, to obtain these incentive payments.  The owner of Prime Solutions testified that it did not purchase any HPE products from ADSI, yet ADSI submitted the fake invoices in support of its claim for a sales incentive payment.  Shahid Sheikh further confirmed, on behalf of ADSI, that he was not aware of any sales to Google either. In other words, any incentive payments paid to sales personnel related to Prime Solutions or Google were unearned and unwarranted.

79.    HPE paid ADSI and its sales representatives incentive payments based on the alleged sales to Prime Solutions and Google.  Thse payments would not have been made except for the misrepresentations that were made to HPE.

### 6.  Purchases from Unauthorized Sources

80.    While still an HPE partner from 2016 until its termination in April 2019, ADSI further breached its Partner Agreement by purchasing and selling hundreds of products from outside the authorized distribution channels and selling to not only end customers, but also affiliates and resellers.

81.    ADSI's records produced in this action reflect that, between August 2016 and April 2019, ADSI purchased at least 771 HPE products from unauthorized resellers, including CentricsIT, Arbitech LLC, and Server Supply.

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

G.      Sale of Counterfeit HPE Products

1.      ADSI's History of Selling Counterfeit Products in the U.S.

82.      According to public court records, ADSI is alleged to have a history of importing and selling counterfeit products.

83.      For example, in a case filed in this Court by Cisco Systems, Inc. (*Cisco Systems, Inc. et al. v. Advanced Data Solutions International, Inc., et al.*, USDC N.D. Cal., Case No. 4:18-cv-07602-YGR), Cisco alleged that U.S. Customs and Border Patrol ("CBP") seized at least 31 separate shipments of counterfeit Cisco products going to ADSI or an affiliated entity between May 2013 and November 2018.   The seized shipments included hundreds of counterfeit transceivers (the same type of product that ADSI sold to the HPE investigator), along with counterfeit labels.

84.      The complaint also alleges that ADSI arranged for UPS receiving locations in far-away locations—Reno, Nevada and Portland, Oregon—with the knowledge and under the direction of Shahid Sheikh and Farhaad Sheikh, to receive counterfeit products from China, and that employees of ADSI put counterfeit labels on transceivers in the ADSI business office in Fremont, so that ADSI could sell those counterfeit products to federal customers on the GSA platform and to other customers.   A former employee of ADSI testified under oath that Shahid Sheikh, Kamran Sheikh, and Farhaad Sheikh were all aware of the counterfeit operations being run and directed by the Sheikhs from the Fremont office location of ADSI, which involved counterfeit products being imported by ADSI from Pretty Technology (aka Wuhan Etopcom) in China.   Kamran Sheikh cooperated in the scheme to import counterfeit products from China by obtaining a receiving location in Reno, Nevada in order to import products.   On April 29, 2016, at the Sheikh's direction, an ADSI employee set up a receiving point at a UPS store in Reno (561 Keystone Ave, #398), more than 200 miles from Fremont.   To do this, she used Kamran Sheikh's credit card.   Subsequent communications between Kamran and the ADSI employee confirmed their joint involvement in procuring this location.   In October 2018, Kamran arranged for an additional UPS store to be opened by a different ADSI employee, this one in Portland, Oregon.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

85.     ADSI's counterfeit operations were not limited to Cisco products.  On November 22, 2017, HPE responded to a request to authenticate 292 HPE transceivers that were seized by the Public Security Bureau in China, from the individuals who operated Wuhan Etopcom and Pretty Technology.  Upon inspection,  HPE confirmed that all 292 of the alleged "HPE" products were counterfeit in that they were not manufactured by or at the direction of HPE, and because they bore labels that were not manufactured by or with authorization from HPE.  HPE also learned about invoices recording sales of "HPE" products by Wuhan Etopcom and Pretty Technology to Advanced Digital Solutions Int'l between June 28, 2016 and June 7, 2017.  The invoices showed the "importer" as either "Advanced Digital Solutions Int'l" or "Advanced Digital Solutions Int'l MCINTOSH NETWORKS" with an address of 561 Keystone Ave, #398 Reno, NV N89503 US, which is substantively the same address that was identified in the Cisco case.  Also included in the invoices was the ADSI email address of Nabia Uddin  (nabia@adsii.com), ADSI's phone number ((510) 509-1757), and an "Attn" line of "Jessica", "Sam" or "Shahid/Sam."

## 2.   Evidential Purchase from ADSI in 2018

86.     Following receipt of this information, in 2018, HPE conducted a test purchase through a licensed investigator of several HPE products from ADSI's online storefront for delivery at the investigator's office located in this district.  Specifically, on June 28, 2018, HPE's investigator purchased two J4858C transceivers, and one HPE iLO Advanced 1-server three-year support license (BD505A-63101).  The products were advertised as "HP" products, and listed the manufacturer name as "Hewlett-Packard."

87.     On July 6, 2018, HPE's investigator received two separate packages containing the products ordered on ADSI's storefront.   The first package contained the two ProCurve Networking transceivers, bearing the following Serial Numbers:  CN949DN227 & CN847DN073, respectively.

 

88.     On August 8, 2018, an engineer working for HPE analyzed the two transceivers and determined that they were counterfeit in that they bore non-genuine HPE labels and did not possess other indicia of authentic HPE transceivers.

89.     In April 2019, HPE terminated ADSI as a channel sales partner.

### 3.  Evidential Purchase from K & F Associates in 2021: Used Sold as New

90.     On or around March 23, 2021, an investigator working for HPE visited K&F's eBay storefront, which operates under the dba Tape4backup.  When reviewing the site, the investigator noticed that one of the images for Tape4backup's offerings for "brand new" HP memory modules showed a serial number that HPE later linked to a purchase by ADSI on a Big Deal number that it had granted to ADSI for end user PayPal.

91.     On April 2, 2021, a different investigator working on behalf of HPE initiated an order from Tape4backup's eBay storefront for two 726722-B21 32 GB memory modules which were being advertised as "BRAND NEW" and "factory sealed" "HP" products.  The investigator was able to purchase the two memory modules for $731.98, or $365.99 each.   On or around April 12, 2021, the investigator received, in Northern California, the two memory modules, which, according to the shipping information, were originally shipped from Rogers, Minnesota.  The transceivers received by the investigator bore the following serial numbers: REBAN86XC40141 and REBAN86XC40145. The packing list received with the products indicated that the products were sold by "K&F Associates, Jerry Paul, 7026 Koll Center Pkwy Suite 221, Pleasanton [sic], California, 94566, United States."

92.     The memory modules received were packaged in anti-static bags, unprotected by any plastic clamshell.  HPE only sells new, factory sealed memory modules of that kind in plastic clamshells, secured by a HPE security label, and accompanied by the warranty and product information print out in each clamshell.  HPE's investigator did not receive the products in that form.  Furthermore, the products showed evidence that they had been used, such as scratches on the connections on the modules, indicating that they had previously been placed in slots for use.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

### 4.   ADSI's Misrepresentation of HPE Partner Status on Storefronts

93.     ADSI operates a website at www.adsii.com/shop/home.  From April 2019, after it was terminated, until at least May 31, 2021, ADSI's main webpage advertised that it was "featured Partners" with Hewlett Packard Enterprise, among other companies, including Samsung, Bluebeam, and Wasp.  During that time period, as ADSI was well aware, it was no longer a member of HPE's channel of sales organizations, and was not an HPE "partner" or Authorized Reseller.  Nonetheless, ADSI continued to represent that HPE is a "featured partner" on the main splash page of its storefront.

94.     In addition, ADSI maintains an Amazon storefront available at www.amazon.com/sp?seller=A3GQGK8PJ4P79P.  From April 2019 until at least May 31, 2021, ADSI represented on its Amazon storefront that it was a "Channel Partner[]" with "hardware manufacturers such as IBM, Hewlett-Packard, Toshiba, Lenovo, ViewSonic, Cisco, … and others," even after ADSI ceased being an HPE channel sales partner in April 2019, and for months after the filing of this action.  The claims on ADSI's webpage and on the ADSI page on the Amazon website were false.  By holding themselves out as an authorized partner, ADSI attempted to, upon information and belief, deceive customers such as the U.S. federal government and other sensitive customers of HPE products that it was safe to purchase HPE products from ADSI and that the HPE products sold by ADSI are sourced from HPE or HPE's authorized distributors.



LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

**H.    Shahid, Freddy, and Kamran's Control Over the Misconduct**

95.    Upon information and belief, at all times identified herein, misconduct by ADSI, including the intentional and knowing breaches of the Partner Agreement, the intentional misrepresentations to HPE and its distributors, and the counterfeit activity, was directed by and overseen by Shahid Sheikh and his sons Kamran and Farhaad "Freddy" Sheikh.

96.    Shahid was regularly copied on correspondence between HPE and ADSI sales representatives regarding HPE storage media opportunities.  In response to a revenue report email sent from Pay Mayock on January 21, 2015, Shahid asked Mayock in the future to also include two other ADSI personnel in his correspondence: klodin@adsii.com and roya@adsii.com. He did not indicate to **only** direct correspondence to these individuals.

97.    According to Mayock, who was ADSI's primary contact person at HPE for the resale of HPE storage media products, Shahid and Freddy were the "management" of ADSI, and he always tried to include them in correspondence because of it.  In particular, for any high level decision making involving terms of particular programs or technology, Mayock would make sure to send it to Shahid or Freddy.  For example, when Mayock sent out the updated terms for the Reseller Incentive Programs for FQ1 2016, he sent it to Shahid, along with ADSI employees Mike Minhas, Norman Karamat and Rita Lu.  In a response the next day confirming ADSI's participation in the program, Lu emailed Mayock, with a copy to Shahid, Minhas and Karamat, stating that she was confirming ADSI's participation in the various reseller incentive programs, and that she had read, understood, and agreed to abide by all of HPE's terms, conditions, and requirements for participation in the program.  Lu again confirmed ADSI's participation in the reseller incentive program for FQ2 2016 on or around February 2, 2016, copying Shahid on the email.  At the end of the second quarter of Fiscal Year 2016, Mayock sent Shahid and Minhas and others at ADSI the records reflecting the sales for that quarter which qualified for incentive payments.  The records showed a large number of products intended for Prime Solutions – in fact, ADSI had ordered over 11,289 products purportedly for Prime Solutions, worth approximately $508,000 at HPE's list price.  Not once did Shahid or Farhaad inform Mayock that they should not be copied or that the transactions should be directed through others.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

98.     At the deposition of ADSI's person most knowledgeable, Shahid Sheikh further testified that he was the CEO of ADSI until January 2019, during the majority of the time period from the Prime Solutions and Google deals, and that he delegated much of his authority to Mike Minhas as the VP of Sales as it related to the day to day sales activities.  But the regular communications copying Shahid and Farhaad show that not much happened at ADSI as it related to HPE products without ADSI's management knowing about it.

99.     In late 2017, certain employees, including Nabia Uddin, Norman Karamat, and Mike Minhas left ADSI to join a different company. Not long after, in January 2018, Shahid reached out to Mayock asking if there was "any special deal for end of jan so I can buy and stock?"  Mayock informed him that HPE was "not set up for discounts for LTO tape, in a stocking order."  Nonetheless, the Google deals continued until at least March 31, 2019

100.    As another example of the Sheikhs' oversight and direct involvement in the day-to-day activities of ADSI, when it came time to submit ADSI's claims for sales incentives on March 1, 2019, Abdul Rehman submitted an invoice on ADSI letterhead claiming incentives for sales to, among other end customers, Google.  On the email, Rehman copied Shahid Sheikh, Farhaad Sheikh, and Kamran Sheikh, along with a "Rosey D."

101.    Furthermore, when HPE sent a letter to ADSI on March 3, 2019, notifying ADSI that its partnership with HPE would be terminated in 30 days on April 4, 2019, Shahid himself reached out to HPE's Mayock directly asking for his help.

102.    Well after ADSI's termination, on September 18, 2019, Shahid sent another email to HPE's Mayock, stating:  "I need your sincere help to get ADSI back in action.  I need the backend rebates activated etc."  Shahid further stated that "...the good news is that we now have a new LOC-ID," and "after presenting [his] case to HPE they agreed to issue the new LOC-ID."  This, of course, was false, as HPE had not issued a new LOC-ID for Shahid or ADSI.  Instead, when HPE reviewed the LOC ID, it determined that it was not an active number.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

103.     Presumably after Shahid failed to hear back from HPE as to his supposed LOC ID, Shahid hatched another plan to further defraud HPE.   On or around May 29, 2020, Shahid, claiming to be "Shawn Shah" from K&F in Danville, CA placed an order with Accutech seeking discounts on HPE products and providing an old LOC ID.   Shahid provided Accutech with the following contact information for K & F Associates, which Accutech conveyed to HPE:

RE: New customer - LOC ID good?                    Sent:    Mon 6/1/2020 3:57:10 PM (UTC)

From:    Todd Patrie

To:    Lasgoity, Monica, storagemediahpe

Hi Monica –
I am going to give them your name and contact #... I'm guessing one of these guys will call you (either Jerry and/or Shawn) – both of their contact info is below..  They really want to get setup with a LOCID for tape purchases..

**Shawn Shah** | *Sales & Service*
shawn@kandfassociates.com
**925-621-8110**
www.kandfassociates.com

**Jerry**
jerry@kandfassociates.com
**K&F Associates**
925.621.8110 X 5112

104.     HPE ultimately refused the discount pricing using the incorrect LOC ID.   But Shahid was not deterred.   On or around June 11, 2020, Shahid, again using the false name "Shawn Shah," applied to become an authorized HPE Partner for "K and F Associates LLC" located at 7026 Koll Center Parkway, Suite 211, Pleasanton, CA 94566.   Shahid, aka Shawn, listed himself as the "Office Manager" for K&F, and signed the document electronically using the same name. At the time, HPE had no reason to suspect that Shahid was acting as "Shawn Shah," or that anyone associated with ADSI was purporting to enter into a new contract with HPE as K&F.   HPE approved K&F's partnership agreement on June 12, 2020.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

# FIRST CLAIM FOR RELIEF

## Federal Trademark Infringement

## (15 U.S.C. § 1114(1)(a))

## Against Defendants Advanced Digital Solutions International, Inc., Shahid Sheikh, and Kamran Sheikh

105.    Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

106.    The TM JV Marks are valid, protectable trademarks that have been registered as marks on the principal register in the United States Patent and Trademark Office. Plaintiffs are the owners and registrants of the TM JV Marks.

107.    As described in more detail above, Defendants have used and counterfeited the TM JV Marks in connection with the marketing, promotion, and sale of their goods and services without Plaintiffs' consent, in a manner that is likely to cause, and has actually caused, confusion and/or mistake, or that has deceived members of the consuming public and/or the trade. Indeed, Defendants' counterfeiting and infringing activities are likely to cause and are actually causing confusion, mistake, and deception among members of the trade and the general consuming public as to the origin, sponsorship, and quality of Defendants' infringing products, counterfeit packaging, inferior warranty, and other related commercial activities.

108.    The TM JV Marks and the goodwill of the business associated with them are tremendously valuable in the United States and worldwide because they are distinctive and universally associated in the public perception with the highest quality network and communications technology products and services.

109.    Defendants have sold, offered to sell, distributed, and advertised—and continue to sell, offer to sell, manufacture, distribute, and advertise—infringing networking hardware products bearing TM JV Marks.

110.    The differences between Defendants' unauthorized products and Plaintiffs' genuine goods are material, as consumers would consider those differences, alleged further above, to be material to their purchasing decisions.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

111.    Defendants' actions have caused, and are likely to continue to cause, confusion, mistake, and deception as to the origin and quality of Defendants' unauthorized products because they are intentionally calculated to mislead the general purchasing public into believing that Defendants' unauthorized products originated from, are associated with, or are otherwise authorized by Plaintiffs.

112.    Upon information and belief, Defendants' infringing actions were committed fraudulently, willfully, and in bad faith, with knowledge of Plaintiffs' exclusive rights to and goodwill in the TM JV Marks, or with willful blindness to the same, and with the intent to cause confusion, to cause mistake and/or to deceive. Accordingly, Defendants' actions constitute willful trademark infringement and counterfeiting of the TM JV Marks in violation of 15 U.S.C. §§ 1114 and 1117.

113.    Defendants' unauthorized use of the TM JV Marks constitutes trademark infringement of the federally registered TM JV Marks and has caused substantial damage to Plaintiffs and to the reputation and goodwill symbolized by the TM JV Marks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114. Defendants' unauthorized use of the TM JV Marks was conducted intentionally and with notice and full knowledge that the use was unauthorized by Plaintiffs.

114.    Plaintiffs have been, and continue to be, damaged by Defendants' infringement, including by suffering irreparable harm through the diminution of trust and goodwill among Plaintiffs' consumers and members of the general consuming public and the trade. Plaintiffs are entitled to an injunction against Defendants, and an order of destruction of all infringing products, as well as all monetary relief and other remedies available under the Lanham Act, including but not limited to trebled damages and/or actual profits, reasonable attorney's fees, costs and prejudgment interest, and/or statutory damages.

**SECOND CLAIM FOR RELIEF**

**Federal Trademark Counterfeiting**

**(15 U.S.C. § 1114(1)(b))**

**Against Defendants Advanced Digital Solutions International, Inc., Shahid Sheikh, and**

**Kamran Sheikh**

115.    Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

116.    The TM JV Marks are valid, protectable trademarks that have been registered as marks on the principal register in the United States Patent and Trademark Office. Plaintiffs are the owners and registrants of the TM JV Marks.

117.    As described in more detail above, Defendants have used and counterfeited the TM JV Marks in connection with the marketing, promotion, and sale of their goods and services without Plaintiffs' consent, in a manner that is likely to cause, and has actually caused, confusion and/or mistake, or that has deceived members of the consuming public and/or the trade. Indeed, Defendants' counterfeiting and infringing activities are likely to cause and are actually causing confusion, mistake, and deception among members of the trade and the general consuming public as to the origin, sponsorship, and quality of Defendants' infringing products, counterfeit packaging, inferior warranty, and other related commercial activities. As of the filing of this Complaint, Defendants are continuing to infringe the TM JV Marks unabated as alleged further above.

118.    Defendants have publicly advertised, sold, offered to sell, and distributed counterfeit TM JV products in interstate commerce in direct competition with Plaintiffs and without authorization or consent to use the TM JV Marks but with full knowledge of Plaintiffs' notorious prior rights in those marks.

119.    Defendants' counterfeit HPE products reproduce, counterfeit, copy, and colorably imitate the TM JV Marks or display a spurious designation that is identical with, or substantially indistinguishable from, the TM JV Marks. Defendants have applied their reproductions, counterfeits, copies, and colorable imitations of the TM JV Marks to labels, prints, and packages

1   intended to be used in commerce upon or in connection with the sale, offering for sale,

2   distribution, or advertising of Defendants' counterfeit products, which is likely to cause confusion,

3   to cause mistake, or to deceive.

4   120.   Defendants' unauthorized use of the TM JV Marks on or in connection with

5   Defendants' counterfeit products was conducted intentionally and with notice and full knowledge

6   that the use was unauthorized by Plaintiffs. Accordingly, Defendants' actions constitute willful

7   trademark infringement and counterfeiting of the TM JV Marks in violation of 15 U.S.C. §§ 1114

8   and 1117.

9   121.   Plaintiffs have been, and continue to be, damaged by Defendants' infringement,

10  including by suffering irreparable harm through the diminution of trust and goodwill among

11  Plaintiffs' consumers and members of the general consuming public and the trade. Plaintiffs are

12  entitled to an injunction against Defendants, and an order of destruction of all infringing products,

13  as well as all monetary relief and other remedies available under the Lanham Act, including but

14  not limited to trebled damages and/or actual profits, reasonable attorney's fees, costs and

15  prejudgment interest, and/or statutory damages.

16  **THIRD CLAIM FOR RELIEF**

17  **Federal Unfair Competition/False Advertising**

18  **(15 U.S.C. § 1125)**

19  **Against Defendant Advanced Digital Solutions International, Inc., Shahid Sheikh, and**

20  **Kamran Sheikh**

21  122.   Plaintiffs incorporate by reference each of the allegations in the preceding

22  paragraphs of this Complaint as though fully set forth herein.

23  123.   Defendants' resale of infringing products that are designed to appear identical to

24  genuine HPE products and thereby employ the same nature, style, look, and color as genuine HPE

25  products. Moreover, as alleged above, Defendants sell products that have affixed counterfeit or

26  infringing versions or reproductions of the TM JV Marks to unauthorized products and/or to the

27  packaging, wrapping, etc., in which the infringing products are packaged. This unauthorized use of

28  the TM JV Marks is likely to cause confusion, to deceive, and to mislead the consuming public

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  into believing that there is some affiliation, connection, or association between Defendants and

2  Plaintiffs and is likely to cause confusion, mistake, or deception as to the origin, source,

3  sponsorship, authorization, approval, or affiliation of Defendants' unauthorized products.

4     124.    Defendants' actions, including the unauthorized use of the TM JV Marks in

5  commerce, constitute false designation of origin, false or misleading descriptions of fact, and false

6  or misleading representations of fact, which have caused, and are likely to continue to cause,

7  confusion, mistake, and deception, as to Defendants' association or affiliation with Plaintiffs, or

8  lack thereof, as well as to the origin, source, and sponsorship of Defendants' unauthorized

9  products, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

10    125.    Defendants, in commercial advertising and promotion, misrepresent the nature,

11  characteristics, qualities, or geographic origin of the HPE products they sold, by falsely

12  advertising that the infringing goods were genuine HPE products and not disclosing that they are

13  not covered by the manufacturer's warranty. The false advertising concerned material information

14  that was likely to influence a consumer's purchasing decision.

15    126.    Defendants' unauthorized and misleading use of the TM JV Marks constitute

16  willful infringement of the TM JV Marks in violation of 15 U.S.C. § 1114(1)(b) and entitling

17  Plaintiffs to treble damages and/or enhanced statutory damages under 15 U.S.C. §§ 1117(b) and

18  (c).

19    127.    Defendants' actions described above, including its unauthorized and misleading use

20  of the TM JV Marks in commerce have caused, and unless enjoined, will continue to cause,

21  substantial and irreparable injury to Plaintiffs and to the business and goodwill represented by the

22  TM JV Marks, thereby leaving Plaintiffs without an adequate remedy at law.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

**FOURTH CLAIM FOR RELIEF**

**Federal Trademark Dilution**

**(15 U.S.C. § 1125(c))**

**Against Defendants Advanced Digital Solutions International, Inc., Shahid Sheikh, and Kamran Sheikh**

128.    Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

129.    The TM JV Marks are famous and well known throughout the United States, on the basis of Hewlett-Packard's exclusive and extensive use for many years of the TM JV Marks.   By reason of more than 75 years of extensive advertising and use of the TM JV Marks, the TM JV Marks have become highly distinctive of Plaintiffs' goods and are uniquely associated with HPDC, HPED, and HPE.

130.    Defendants' unauthorized commercial use of the TM JV Marks on the counterfeit "HPE" products has diluted and continues to dilute the distinctive quality of the TM JV Marks by lessening their capacity to identify and distinguish HPE, HPDC and HPED exclusively as the sources of goods bearing or provided under the TM JV Marks.

131.    Defendants' commercial use of the TM JV Marks further dilutes the TM JV Marks by associating them with a product of inferior quality, thereby tarnishing the TM JV Marks.  For example, when customers expend money in exchange for HPE products, part of the consideration for which they bargain is the authenticity of the product.  When "HPE" products are advertised as "new" and marked as "HP", "Hewlett Packard Enterprise", or "HPE" but are not in fact produced with HPE's high-quality materials, the customers mistakenly associate the inferior product with Plaintiffs' reputations and quality control over their products

132.    Defendants do not own any federal or state registrations or trademark applications for any mark that includes, in whole or in part, any of the TM JV Marks, and cannot assert any rights in any of the TM JV Marks that are prior to Plaintiffs' first respective uses of the TM JV Marks.

133.    Defendants' conduct, as described in paragraphs 19 through 25 above, dilutes, blurs, and tarnishes the TM JV Marks in a manner that destroys the distinctiveness of the famous TM JV Marks, causing damage to HPDC and HPED, and the business and goodwill represented by the TM JV Marks in violation of the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c), in an amount to be proven at trial.

134.    Defendants' actions that have diluted the TM JV Marks have caused, and unless enjoined, will continue to cause, substantial and irreparable injury to Plaintiffs, the TM JV Marks, and to the business and goodwill represented by the TM JV Marks, such that Plaintiffs have no adequate remedy at law.

### FIFTH CLAIM FOR RELIEF

### California Statutory Misleading and Deceptive Advertising

### (Cal. Bus. & Prof. Code § 17500, *et seq.*)

### Against Defendant Advanced Digital Solutions International, Inc.

135.    Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

136.    Defendants have made false and misleading statements about their relationship and/or association with Plaintiffs.

137.    Defendants also misleadingly advertised its HPE products as new, when in actuality the products were counterfeit, as confirmed by Plaintiffs' brand protection engineers, or pre-owned.

138.    Defendants knew that these statements were false or misleading, or with reasonable care, should have known them to be false or misleading.

139.    Defendants' statements have misled, or are likely to mislead, a reasonable consumer into believing that Defendants were selling products as an reseller authorized by Plaintiffs, and that the products sold by Defendants are new, original, and eligible for other services provided for genuine HPE products.

140.    The conduct alleged above constitutes false and misleading advertising, in violation of Section 17500, et seq. of California's Business and Professions Code.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

141.   Plaintiffs have suffered loss of money as a result of Defendants' misleading and false advertising. Defendants have, and will continue to cause, irreparable injury to Plaintiffs, including injury to Plaintiffs' reputation and goodwill. Defendants' activities, unless restrained, will continue to cause further irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law.

**SIXTH CLAIM FOR RELIEF**

**Unjust Enrichment**

**(Common Law)**

**Against Defendants Advanced Digital Solutions International, Inc., K & F Associates, and Shahid Sheikh**

142.   Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

143.   Defendants unjustly received benefits at the expense of Plaintiffs through their wrongful conduct, as alleged further above. Defendants continue to unjustly retain these benefits at the expense of Plaintiffs. The unjust receipt of the benefits obtained by Defendants lacks any adequate legal basis and thus cannot conscientiously be retained by Defendants. Therefore, the circumstances of the receipt and retention of such benefits are such that, as between Plaintiffs and Defendants, it is unjust for Defendants to retain any such benefits.

144.   Plaintiffs are therefore entitled to full restitution of all amounts and/or other benefits in which Defendants have been unjustly enriched at Plaintiffs' expense, in an amount to be proven at trial.

**SEVENTH CLAIM FOR RELIEF**

**California Unfair Competition**

**(Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

**Against Defendants Advanced Digital Solutions International, Inc., K & F Associates, Shahid Sheikh, Farhaad Sheikh, and Kamran Sheikh**

145.   Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

146.    California Business and Professions Code §§ 17200 *et seq.* prohibits acts of unfair competition, which includes any unlawful business act or practice.

147.    Defendants have knowingly, willfully, and unlawfully infringed the TM JV Marks, including through the sale of infringing HPE networking hardware products in violation of the Lanham Act, 15 U.S.C. § 1114.

148.    As a direct, proximate, and foreseeable result of Defendants' sale of infringing HPE networking hardware parts, Plaintiffs have further been deprived of lost revenue and payments, and have therefore sustained injury in fact.

149.    Defendants' practices were unlawful, and constitute unfair competition as defined by Cal. Bus. & Prof. C. §§ 17200 *et seq.* Defendants' misconduct was unlawful because, as described herein, their misconduct constitutes violations of numerous state and federal statutes, including but not limited to Cal. Civ. Code § 1797.81, conversion, state false advertising laws such as Cal. Bus. Prof. Code § 17500, as well as the Lanham Act, 15 U.S.C. §§ 1114 and 1125, and the Federal Trade Commission Act, 15 U.S.C. § 45. Further, their alleged conduct was unfair in that Defendants' actions, as described herein, significantly threatened and/or harmed competition through infringement, counterfeiting, false advertising, conversion, and circumvention, which undermines Plaintiffs' ability to fairly compete in the marketplace.

150.    As a direct and proximate result of Defendants' unlawful and unfair business practices, Plaintiffs have lost money and property, and have suffered irreparable injury to their brand, business reputation, and goodwill. As such, Plaintiffs' remedy at law is not adequate to compensate for the injuries inflicted by Defendants. Accordingly, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief against Defendants, in addition to restitution in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF

### Breach of Contract (Prime Solutions as Fake End Customer)

### Against Defendants Advanced Digital Solutions International, Inc., and Shahid Sheikh

151.    Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

152.    Defendant ADSI applied for and was approved to be an authorized HPE partner and member of HPE's channel sales organization. Upon doing so, ADSI was subject to the material terms of the Hewlett Packard Enterprise Company U.S. Partner Agreement and its various Addendums, which are set forth in Section V.E.2 above.  ADSI also entered into a further agreement with HPE with respect to specific "Big Deal" terms for special discounts for sales of HPE products to end customer Prime Solutions.

153.    Defendant ADSI was an authorized HPE partner (and before that, an authorized HP partner) for all material times, until HPE terminated the contract in April 2019.

154.    At all material times, Plaintiffs performed pursuant to the terms of the agreement.

155.    Defendant ADSI breached the agreement by requesting from HPE special discounts for products that were allegedly to be sold to Prime Solutions, but never were, as confirmed by both the owner of Prime Solutions and Defendant ADSI. ADSI sales personnel continually represented to HPE as well as HPE's authorized distributors that Prime Solutions was the real end customer for the products they were ordering under the Big Deal program, and never indicated to Plaintiffs that Prime Solutions was not the true end customer.  If ADSI had informed HPE that it was not selling the products to Prime Solutions, HPE would not have approved allowing ADSI to receive the discounts that were associated with sales for the specific authorized end customer (in this instance, Prime Solutions).

156.    Defendant ADSI was also subject to the terms and conditions of HPE's sales incentive programs, such as "Engage and Grow," "LTO 6 Growth Program," and "HP Reseller Storage Media Incentive Program," which generally forbid participants from submitting false claims or incorrect information in order to receive the incentive payments.  Defendant ADSI has breached these terms and conditions by submitting claims for sales incentives based on the fraudulent sales to Prime Solutions and providing fake invoices to HPE in support of its claim.

157.    For each of the breaches by ADSI related to purchases and sales of HPE products for purported end user Prime Solutions, Defendant Shahid Sheikh was acting as the alter ego of ADSI and caused each breach to occur, as the principal of ADSI and as the principal of K & F Associates for each of the breaches.  Upon information and belief, Shahid used K & F Associates

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    to resell HPE products fraudulently obtained under the Prime Solutions account.  In addition to the

2    oversight and direction described in Section V.H, supra, Shahid managed each of the bank

3    accounts that were used to purchase HPE Products from HPE's distributors.  Upon information

4    and belief, Shahid used both ADSI and K & F Associates as mere conduits so that he and his

5    family could personally benefit from the misrepresentations to HPE and its distributors.  Among

6    other things, Shahid, and his wife, Roya, had sole control over the financial accounts used to pay

7    for HPE products purchased from HPE and its authorized distributors, and Shahid Sheikh himself,

8    upon information and belief, signed the checks or authorized the wires made to pay for the

9    products, knowing that such products were not going to be sold to Prime Solutions.

10          158.    As a direct and proximate result of their breaches of the agreements with Plaintiffs,

11   Plaintiffs have been damaged in an amount according to proof.

**NINTH CLAIM FOR RELIEF**

**Breach of Contract (Google as Fake End Customer)**

**Against Defendants Advanced Digital Solutions International, Inc., and Shahid Sheikh**

15          159.    Plaintiffs incorporate by reference each of the allegations in the preceding

16   paragraphs of this Complaint as though fully set forth herein.

17          160.    Defendant ADSI applied for and was approved to be an authorized HPE partner

18   and member of HPE's channel sales organization. Upon doing so, Defendant ADSI was subject to

19   the material terms of the Hewlett Packard Enterprise Company U.S. Partner Agreement and its

20   various Addendums, which are set forth in Section V.E above.  ADSI also entered into a further

21   agreement with HPE with respect to specific "Big Deal" terms for special discounts for sales of

22   HPE products to end customer Google.

23          161.    Defendant ADSI was an authorized HPE partner (and before that, an authorized HP

24   partner) for all material times, until HPE terminated the contract in April 2019.

25          162.    At all material times, Plaintiffs performed pursuant to the terms of the agreement.

26          163.    Defendant ADSI breached the agreement by requesting from HPE special discounts

27   for products that were to be sold to Google but never were.  If ADSI had informed HPE that it was

28   not selling the products to Google, HPE would not have approved allowing ADSI to receive the

9272-30\4714176v15

Case No. 3:20-cv-5447 VC

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   discounts that were associated with sales for the specific authorized end customer (in this instance,

2   Google).

3        164.    Defendant ADSI was also subject to the terms and conditions of HPE's sales

4   incentive programs, such as "Engage and Grow," "LTO 6 Growth Program," and "HP Reseller

5   Storage Media Incentive Program," which generally forbid participants from submitting false

6   claims or incorrect information in order to receive the incentive payments.  Defendant ADSI has

7   breached these terms and conditions by submitting claims for sales incentives based on the

8   fraudulent sales to Google.

9        165.    For each of the breaches by ADSI related to purchases and sales of HPE products

10  for purported end user Google, Defendant Shahid Sheikh was acting as the alter ego of ADSI and

11  caused each breach to occur, as the principal of ADSI and as the principal of K&F Associates for

12  each of the breaches.  Upon information and belief, Shahid used K&F Associates to resell HPE

13  products fraudulently obtained under the Google account.  In addition to the oversight and

14  direction described in Section V.H, supra, Shahid managed each of the bank accounts that were

15  used to purchase HPE Products from HPE's distributors.  Upon information and belief, Shahid

16  was the signatory to each of the checks that was conveyed to HPE's distributors to purchase the

17  products claimed to be going to Google.  Upon information and belief, Shahid used both ADSI

18  and K&F Associates as mere conduits so that he and his family could personally benefit from the

19  misrepresentations to HPE and its distributors.  Among other things, Shahid, and his wife, Roya,

20  had sole control over the financial accounts used to pay for HPE products purchased from HPE

21  and its authorized distributors, and Shahid Sheikh himself, upon information and belief, signed the

22  checks or authorized the wires made to pay for the products, knowing that such products were not

23  going to be sold to Google.

24       166.    As a direct and proximate result of their breaches of the agreements with Plaintiffs,

25  Plaintiffs have been damaged in an amount according to proof.

26

27

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

**TENTH CLAIM FOR RELIEF**

**Breach of Contract (PayPal as Fake Customer)**

**Against Defendants Advanced Digital Solutions International, Inc., and Shahid Sheikh**

167.    Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

168.    Defendant ADSI applied for and was approved to be an authorized HPE partner and member of HPE's channel sales organization. Upon doing so, Defendant ADSI was subject to the material terms of the Hewlett Packard Enterprise Company U.S. Partner Agreement and its various Addendums, which are set forth in Section V.E above.  ADSI also entered into a further agreement with HPE with respect to specific "Big Deal" terms for special discounts for sales of HPE products to end customer PayPal.

169.    Defendant ADSI was an authorized HPE partner (and before that, an authorized HP partner) for all material times, until HPE terminated the contract in April 2019.

170.    At all material times, Plaintiffs performed pursuant to the terms of the agreement.

171.    Defendant ADSI breached the agreement by requesting from HPE special discounts for products that were allegedly to be sold to PayPal, but never were.  If ADSI had informed HPE that it was not selling the products to PayPal, HPE would not have approved allowing ADSI to receive the extra discounts that were associated with sales for the specific authorized end customer (in this instance, PayPal).

172.    As a direct and proximate result of their breaches of the agreements with Plaintiffs, Plaintiffs have been damaged in an amount according to proof.

**ELEVENTH CLAIM FOR RELIEF**

**Breach of Contract (Other Fake Customers)**

**Against Defendants Advanced Digital Solutions International, Inc., and Shahid Sheikh**

173.    Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

174.    Defendant ADSI applied for and was approved to be an authorized HPE partner and member of HPE's channel sales organization. Upon doing so, Defendant ADSI was subject to

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  the material terms of the Hewlett Packard Enterprise Company U.S. Partner Agreement and its

2  various Addendums, which are set forth in Section V.E above.  ADSI also entered into a further

3  agreement with HPE with respect to specific "Big Deal" terms for special discounts for sales of

4  HPE products to end customer PayPal.

5      175.    Defendant ADSI was an authorized HPE partner (and before that, an authorized HP

6  partner) for all material times, until HPE terminated the contract in April 2019.

7      176.    At all material times, Plaintiffs performed pursuant to the terms of the agreement.

8      177.    Defendant ADSI breached the agreement by requesting from HPE special discounts

9  for products that were allegedly to be sold to end customers other than Prime Solutions, Google,

10  or PayPal, as identified in paragraph 76 of this Complaint, but never were.  If ADSI had informed

11  HPE that it was not selling the products to the identified end customer, HPE would not have

12  approved allowing ADSI to receive the extra discounts that were associated with sales for the

13  specific authorized end customer.

14      178.    As a direct and proximate result of their breaches of the agreements with Plaintiffs,

15  Plaintiffs have been damaged in an amount according to proof.

16              **TWELFTH CLAIM FOR RELIEF**

17           **Breach of Contract (Sales to K & F Associates)**

18  **Against Defendants Advanced Digital Solutions International, Inc., and Shahid Sheikh**

19      179.    Plaintiffs incorporate by reference each of the allegations in the preceding

20  paragraphs of this Complaint as though fully set forth herein.

21      180.    Defendant ADSI applied for and was approved to be an authorized HPE partner

22  and member of HPE's channel sales organization. Upon doing so, ADSI was subject to the

23  material terms of the Hewlett Packard Enterprise Company U.S. Partner Agreement and its

24  various Addendums, which are set forth in Section V.E above.

25      181.    Defendant ADSI was an authorized HPE partner (and before that, an authorized HP

26  partner) for all material times, until HPE terminated the contract in April 2019.

27      182.    At all material times, Plaintiffs performed pursuant to the terms of the agreement.

28

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   183.   Defendant ADSI breached the agreement by selling HPE products to ADSI's

2   affiliate business, K & F Associates, which resells HPE products online.

3   184.   As a direct and proximate result of their breaches of the agreements with Plaintiffs,

4   Plaintiffs have been damaged in an amount according to proof.

5   **THIRTEENTH CLAIM FOR RELIEF**

6   **Breach of Contract (Purchases from Unauthorized Sources)**

7   **Against Defendants Advanced Digital Solutions International, Inc., and Shahid Sheikh**

8   185.   Plaintiffs incorporate by reference each of the allegations in the preceding

9   paragraphs of this Complaint as though fully set forth herein.

10   186.   Defendant ADSI applied for and was approved to be an authorized HPE partner

11   and member of HPE's channel sales organization. Upon doing so, Defendant ADSI was subject to

12   the material terms of the Hewlett Packard Enterprise Company U.S. Partner Agreement and its

13   various Addendums, which are set forth in Section V.E above.

14   187.   Defendant ADSI was an authorized HPE partner (and before that, an authorized HP

15   partner) for all material times, until HPE terminated the contract in April 2019.

16   188.   At all material times, Plaintiffs performed pursuant to the terms of the agreement.

17   189.   Defendant ADSI breached the agreement by purchasing HPE products from outside

18   the authorized distribution channel, which increases the risk of purchasing counterfeit or other

19   substandard goods.

20   190.   As a direct and proximate result of their breaches of the agreements with Plaintiffs,

21   Plaintiffs have been damaged in an amount according to proof.

22   **FOURTEENTH CLAIM FOR RELIEF**

23   **Fraud**

24   **Against Defendants Advanced Digital Solutions International, Inc., K & F Associates, and**

25   **Shahid Sheikh**

26   191.   Plaintiffs incorporate by reference each of the allegations in the preceding

27   paragraphs of this Complaint as though fully set forth herein.

28

192.   Defendant ADSI requested special discounts from Plaintiffs for products that it allegedly claimed to sell to end users, including Prime Solutions, Google, and PayPal.

193.   Defendant ADSI was also subject to the terms and conditions of HPE's sales incentive programs, such as "Engage and Grow," "LTO 6 Growth Program," and "HP Reseller Storage Media Incentive Program," which generally forbid participants from submitting false claims or incorrect information in order to receive the incentive payments.

194.   Defendant ADSI and its personnel knowingly submitted claims for sales incentives based on the fraudulent sales to Prime Solutions and Google, using fake invoices to support their claims.

195.   Defendant ADSI's representations were false.   Defendant ADSI knowingly misrepresented the facts about the end customers—falsely claiming that its customers were Google, PayPal, and Prime Solutions—with the intent to deceive Plaintiffs so that Plaintiffs would rely on misrepresentations.   Defendant ADSI never sold the discounted HPE products to Prime Solutions, Google, nor PayPal as it claimed it did, but instead sold them to other customers or its affiliate business K & F Associates, in contravention of the Agreement.   Defendant ADSI and its personnel further used these fraudulent sales as well as fake invoices to claim sales incentive payments.   Defendant Shahid Sheikh was in the unique position to know all of the material facts as the CEO of ADSI when ADSI made the misrepresentations, and the principal of K & F Associates, when ADSI sold the products to K & F Associates.

196.   Plaintiffs were not aware of the falsity of Defendant ADSI's misrepresentations and could not have discovered the truth through reasonable efforts.   In fact, Plaintiffs only recently discovered these falsehoods during discovery in this Action.

197.   Plaintiffs justifiably relied on Defendant ADSI's representations to Plaintiffs' detriment by approving the special discounts.   Plaintiffs would not have approved such discounts had they known that these statements were false.

198.   As a direct and proximate result of their fraud, Plaintiffs have been damaged in an amount according to proof.

AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

**FIFTEENTH CLAIM FOR RELIEF**

**Conversion**

**Against Defendants Advanced Digital Solutions International, Inc., K & F Associates, and Shahid Sheikh**

199.    Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein.

200.    Defendants ADSI, K & F Associates, and Shahid Sheikh have wrongfully and intentionally converted property in the form of unearned product discounts and sales incentive payments that rightfully belongs to Plaintiffs.

201.    Plaintiffs incurred damages due to Defendants' conversion of their property, and Defendants' intentional conduct was a substantial factor in causing such harm.

202.    Because of Defendants' conversion, Plaintiffs have been damaged in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiffs respectfully pray for the following relief:

A.    For entry of judgment in favor of Plaintiffs and against Defendants on each of Plaintiffs' claims for relief alleged in this Complaint;

B.    For a preliminary and permanent injunction restraining Defendants, their officers, agents, servants, employees, attorneys, and affiliated companies, their assigns and successors in interest, and those persons in active concert or participation with them, from (i) further acts of infringement of the trademarks at issue in this litigation, including inducing or contributing third parties to infringe, (ii) further acts of conversion, and, (iii) further acts of unfair competition and/or false advertising against Plaintiffs;

C.    For a determination that Defendants' acts of trademark infringement constitute cases of willful and exceptional infringement;

D.    For actual damages as a result of Defendants' unlawful conduct, alleged above, as well as any profits that are attributable to the alleged conduct and are not taken into account in computing Plaintiffs' actual damages;

E.      For maximum statutory damages available under the law to the extent Plaintiffs elect statutory damages for any claim for relief;

F.      For punitive damages to the fullest extent available under the law;

G.      For reasonable attorneys' fees to the fullest extent available under the law;

H.      For treble and/or enhanced damages to the fullest extent available under the law;

I.       For full restitution, including restoration of all property unlawfully taken from Plaintiffs, as well as any ill-gotten gains from the resale of Plaintiffs' property or other unjust benefits received and retained by Defendants;

J.       For prejudgment interest and the costs of prosecuting these claims to the fullest extent available under the law;

K.      For any additional injunctive, specific performance, and/or other provisional remedies, as appropriate; and,

L.      For such other and further relief as the Court deems just and proper.

DATED: August 16, 2021                   SIDEMAN & BANCROFT LLP


By:       /s/ *Richard J. Nelson*
          _____
          Richard J. Nelson
          Attorneys for Plaintiffs
          Hewlett Packard Enterprise Company,
          Hewlett Packard Enterprise Development LP, and
          Hewlett-Packard Development Company, L.P.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

## JURY DEMAND

Pursuant to Civ. L.R. 3-6 and Fed. R. Civ. Proc. 38, Plaintiffs Hewlett Packard Enterprise Company, Hewlett Packard Enterprise Development LP, and Hewlett-Packard Development Company, L.P.  hereby demand a trial by a jury on all issues herein so triable.


DATED:  August 16, 2021                    SIDEMAN & BANCROFT LLP


                                By:    /s/ *Richard J. Nelson*
                                       Richard J. Nelson
                                       Attorneys for Plaintiffs
                                       Hewlett Packard Enterprise Company,
                                       Hewlett Packard Enterprise Development LP, and
                                       Hewlett-Packard Development Company, L.P.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711